**Patrick CATRONE, Plaintiff, Appellant,**

v.

**THOROUGHBRED RACING ASSOCIATIONS OF NORTH AMERICA, INC., et al., Defendants, Appellees.**

**No. 90–1071.**

United States Court of Appeals, First Circuit.

Heard Aug. 1, 1990.

Decided April 11, 1991.

---

882

David L. Kelston, with whom Friedman & Atherton, was on brief, Boston, Mass., for plaintiff, appellant.

Jack Kaplan, with whom Carter, Ledyard & Milburn, New York City, Michael J. Liston, Palmer & Dodge, Boston, Mass., and Elizabeth A. Bryson, were on brief, New York City, for defendants, appellees.

Before TORRUELLA and CYR, Circuit Judges, and RE,* Judge.

CYR, Circuit Judge.

Appellant Patrick Catrone, a professional trainer of thoroughbred racehorses, appeals from summary judgments entered in favor of Thoroughbred Racing Protective Bureau, Inc. ("Protective Bureau") and its parent, Thoroughbred Racing Associations of North America, Inc. ("TRA"), on Catrone's state-law claims for defamation and for intentional interference with advantageous business relationships.[1] The district court concluded that Catrone's claims were either barred by the Massachusetts statute of limitations or predicated on privileged communications. We affirm the district court judgments.

I

BACKGROUND

TRA is a trade association whose members operate racetracks throughout the United States and Canada. The Protective Bureau, TRA's wholly-owned subsidiary, provides investigative and security services for TRA-member tracks. The Protective Bureau investigates alleged wrongdoing in thoroughbred horse racing, including rules violations at member tracks, and compiles various types of reports for dissemination among TRA-track managements and state racing commissions.[2] Protective Bureau

---

* The Honorable Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation.

1. We relate only the facts necessary to the present discussion and refer the reader to the district court opinions for further detail. *See Catrone v. Thoroughbred Racing Asso.,* 727 F.Supp. 717 (D.Mass.1989); *Catrone v. Ogden Suffolk Downs, Inc.,* 683 F.Supp. 302 (D.Mass. 1988) (dismissing federal antitrust and civil rights claims).

2. Prior to 1981 the Protective Bureau prepared *special reports* on individuals deemed inimical to racing, based on observations by Protective Bureau agents, information gathered from witnesses, and pertinent documents. *Summary reports* and *incident reports,* which may include background information on the subject individual, continued to be compiled and circulated by the Protective Bureau.

reports normally are not distributed to *non*-TRA officials, except on request and in confidence. It is TRA policy that Protective Bureau reports not contain information more than seven years old.

Catrone's alleged participation in various illegal activities has been the subject of numerous Protective Bureau reports since the early 1970's. In 1971, the Protective Bureau investigated allegations that Catrone was involved in running "ringers" at several TRA tracks.[3] Following that investigation, Catrone was indicted by a federal grand jury in Massachusetts and suspended from racing in New Jersey. He was acquitted of the federal charge, and the New Jersey racing suspension was vacated by court order. The Protective Bureau submitted investigative information to the New Hampshire Racing Commission during 1976, which led to the denial of Catrone's New Hampshire license application. Massachusetts followed suit and denied Catrone a license in 1977. In late 1981, however, after Catrone had been relicensed in Massachusetts and had resumed racing at Suffolk Downs, a *non*-TRA track, he was banned from Suffolk Downs, based in part on information provided by the Protective Bureau. The Massachusetts Appeals Court upheld the Suffolk Downs ban. *Catrone v. State Racing Commission,* 17 Mass.App.Ct. 484, 459 N.E.2d 474 (1984). Since 1985 Catrone has been the subject of Protective Bureau investigations into incidents at TRA tracks in New Hampshire and Florida.

Catrone commenced the present action on May 16, 1986, alleging, *inter alia,* that various Protective Bureau reports were defamatory and constituted intentional interferences in advantageous business relationships Catrone enjoyed as a professional trainer. Among the six operative communications distilled from among the more than 1,000 documents produced during discovery, Catrone's claims based on two communications—a 1974 special report and a 1978 newsletter—were debarred by the dis-

trict court under the three-year statute of limitations, *see* Mass.G.L. ch. 260 § 2A (intentional interference), § 4 (defamation). Concluding that the four remaining reports were privileged, the district court entered summary judgment against Catrone on all claims.

Catrone contends on appeal that the defamation and intentional interference claims are not time barred, as the confidential contents of the 1974 special report and the 1978 newsletter remained "inherently unknowable" to Catrone until well within the three-year limitations period, and that the four other reports either were not within the scope of the qualified privilege or, in the alternative, that the privilege was abused and forfeited by the appellees.

## II

## DISCUSSION

*Summary Judgment*

■ Summary judgments are subject to plenary appellate review, *Siegal v. American Honda Motor Co.,* 921 F.2d 15, 17 (1st Cir.1990); *Petitti v. New England Tel. & Tel. Co.,* 909 F.2d 28, 30–31 (1st Cir.1990); *E.H. Ashley & Co. v. Wells Fargo Alarm Services,* 907 F.2d 1274, 1277 (1st Cir.1990), under the same standards that govern the trial court, *Jensen v. Frank,* 912 F.2d 517, 520 (1st Cir.1990). Summary judgment is warranted only when the record, viewed favorably to the nonmoving party, evinces no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See, e.g., Siegal,* 921 F.2d at 17; *Jensen,* 912 F.2d at 520.

■ The nonmoving party can fend off a motion for summary judgment by setting forth specific facts sufficient to demonstrate that every essential element of its claim or defense is at least trialworthy. *See Siegal,* 921 F.2d at 17. A summary judgment issue is not trialworthy unless

---

3. A "ringer" is "a fast horse that is run under the identity of a slower horse," *Catrone,* 683 F.Supp. at 304 & n. 1, which "permits the perpetrator to bet large sums of money at odds made very

favorable by the public's ignorance of the switch," *Lewitus v. Colwell,* 479 F.Supp. 439, 442 (D.Md.1979).

there is enough evidence for a jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (citations omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.*

### Massachusetts' Discovery Rule

The district court concluded that Catrone's claims stemming from the 1974 special report and the 1978 newsletter are barred since those communications occurred more than three years before the commencement of the present suit in 1986. Catrone does not question the applicability of the three-year limitations period under Mass.G.L. ch. 260 §§ 2A and 4, but relies instead on the Massachusetts discovery rule which provides that a cause of action for the redress of an "inherently unknowable" wrong does not accrue until the harm becomes known, or in the exercise of reasonable diligence should have become known, to the injured party. *See Flynn v. Associated Press*, 401 Mass. 776, 519 N.E.2d 1304, 1307 (1988) (describing various applications of "discovery rule"); *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 130–131 (1st Cir.1987) (once on "notice" of possibility of fraud, plaintiff was required to act "in a reasonably diligent

manner" to discover "facts" underlying claim).

■ Under the Massachusetts discovery rule, the running of the statute of limitations is delayed while "the facts," as distinguished from the "legal theory for the cause of action," remain "inherently unknowable" to the injured party. *Gore v. Daniel O'Connell's Sons, Inc.*, 17 Mass. App.Ct. 645, 461 N.E.2d 256, 259 (1984) ("if the action is based on an inherently unknowable wrong, it accrues when the injured party knew, or in the exercise of reasonable diligence, should have known of the factual basis of the cause of action.") (personal injury action); *see also Cornell v. E.I. Du Pont de Nemours & Co.*, 841 F.2d 23 (1st Cir.1988). The plaintiff bears the burden of presenting facts sufficient to take the case outside the statute of limitations. *Franklin v. Albert*, 381 Mass. 611, 411 N.E.2d 458, 463 (1980).

■ Catrone concedes that the 1978 newsletter was widely disseminated among racetrack managements and state racing commissions.[4] The 1978 newsletter specifically identified Catrone as the subject of the 1974 special report [*i.e.*, "Special Report Subject # 113"], "a particularly nefarious character" among "racing's most undesirable figures."[5] The district court con-

---

**4.** The 1978 newsletter, in its entirety, stated: Throughout the existence of TRPB, certain of racing's most undesirable figures have become the subjects of TRPB Special Reports. This program will continue and it will still be TRPB policy to oppose relicensing of Special Report Subjects whenever they might apply for a hearing before a Racing Commission. On March 22nd, 1978, Mr. Paul Berube appeared at a hearing of the Florida Division of Pari-Mutuel Wagering in Miami in opposition to Patrick Catrone, Special Report Subject # 113. Catrone is a particularly nefarious character who was at the center of a conspiracy in 1969–1972 to race superior horses under the names and identities of inferior ones. *Without a doubt, Catrone is an outright detriment to racing.* In the past three years, he has been denied a license in Maryland, Rhode Island, New Hampshire (by formal ruling), New York and Pennsylvania. Florida's decision on licensing of Catrone is not presently known, however, I am thankful for the opportunity which TRPB had to oppose the licensure.

**5.** The 1974 special report details numerous instances in which Catrone is alleged to have violated the rules of racing. These include: (1) Several incidents in 1971, involving a horse entered under the name "El Toro Tortuga," which the report alleges was in fact a "ringer" named "Rule Away," the deception having been accomplished through the use of a fraudulent foal certificate. Catrone is alleged to have been involved in training, transporting and wagering on the alleged ringer; (2) Catrone was linked directly to three other horse substitution schemes alleged to have taken place between 1969 and 1972: the running of the horse "Glamour Man" as "Choice Dare" in Maryland; the running of the superior horse "Greek Flare" as "Ritter" and as "Take to Task" in Maryland; the running of "Show Scene" as "Dared to Talk" in Maryland; (3) Catrone was linked indirectly to the running of "Birthday Star" as "Nebraska Farmer" in Maryland. The 1974 special report noted further that Catrone had been denied racing privileges at all tracks in New Jersey and Maryland.

cluded that Catrone was on notice that the 1978 newsletter had been widely disseminated and that it related highly derogatory information. The court determined that Catrone, "employing some diligence," should have learned of the dissemination of the 1974 special report as well as the 1978 newsletter. Accordingly, the fact that the 1978 newsletter and the 1974 special report contained highly derogatory information about Catrone could not have remained "inherently unknowable" until May 15, 1983.

Summary judgment is appropriate where there is "no dispute as to essential evidentiary facts" controlling the application of the discovery rule. *Fidler v. E.M. Parker Co.*, 394 Mass. 534, 476 N.E.2d 595, 602 (1985). The summary judgment record, viewed most favorably to Catrone, reveals that Catrone had *actual knowledge*, not later than 1976, that the Protective Bureau was publishing derogatory reports about him, as demonstrated by the uncontroverted fact that, at his license application hearing before the New Hampshire Racing Commission in August 1976, Catrone was confronted with allegations of serious wrongdoing, principally concerning the running of "ringers." The record indicates that these allegations were based almost entirely on Protective Bureau investigative reports.[6] Although the precise content of the reports with which Catrone was confronted at the license hearing is not entirely clear, the Commission's letter to Catrone, explaining its denial of a license, states that Catrone had been asked at the hearing "to respond to several serious allegations ... supported in investigative reports which the Commission had received from the Thoroughbred Racing Protective Bureau, Inc." and that Catrone had denied these allegations. In fact, the Commission letter expressly referred to each of the "ringer" incidents related in the 1974 special report (involving "El Toro Tortuga,"

"Ritter," "Dared to Talk," and "Choice Dare"). *See supra* note 5.

■ Thus, not later than September 1976, Catrone knew, or reasonably should have known, "the factual basis for a cause of action" relating to the contents of the 1974 special report. *See Gore*, 461 N.E.2d at 259. Furthermore, the 1978 newsletter contained no defamatory information other than that included in the 1974 special report. Since Catrone and the Protective Bureau were involved in several similar regulatory encounters during the ensuing years, we must conclude that Catrone, in the exercise of reasonable diligence, should have learned of any wrong done to him by the 1978 newsletter and the 1974 special report, years in advance of May 15, 1983.

■ Catrone's contention that these causes of action did not accrue until he learned the exact nature of the particular statements and allegations in the 1974 special report and the 1978 newsletter distorts the Massachusetts discovery rule. Under Massachusetts law, a " 'cause of action accrues on the happening of an event likely to put the plaintiff on notice.' " *Flynn*, 519 N.E.2d at 1307, quoting *Hendrickson v. Sears*, 365 Mass. 83, 310 N.E.2d 131, 135 (1974). "The 'notice' required is not notice of every fact which must eventually be proved in support of the claim. These details are properly the subject of requests for discovery once an action is filed." *White v. Peabody Constr. Co.*, 386 Mass. 121, 434 N.E.2d 1015, 1020–1021 (1982). The "notice" envisioned under the discovery rule arises on acquisition of the requisite "knowledge that an injury has occurred." *Id.* 434 N.E.2d at 1021. Construed as Catrone would have it, the discovery rule would be deprived of its "notice" component.

---

**6.** On September 9, 1976, the New Hampshire Racing Commission sent Catrone and his attorney a detailed statement of its findings and a notification of its denial of Catrone's license application. The letter stated: "The Commission recognizes that the allegations against Mr. Catrone in this case were substantially in the form of investigative reports from the [Protec-

tive Bureau]." The Commission letter additionally asserted that Catrone denied the truth of some, though not all, of the allegations against him. Thus, by the autumn of 1976, Catrone was on notice that the Protective Bureau had disseminated investigative reports containing statements which Catrone considered false.

■ Once on "notice" that the Protective Bureau was publishing defamatory communications, reasonable diligence required that Catrone at least attempt to discover their particular content. *See Cornell*, 841 F.2d at 24; *Fidler v. Eastman Kodak Co.*, 714 F.2d 192, 199 (1st Cir.1983) (plaintiff has "duty to discover" whether the facts "support[ ] a legal claim") (medical malpractice). The record is devoid of evidence that Catrone attempted, diligently or otherwise, to discover the defamatory statements contained in the 1974 special report or the 1978 newsletter. Only by entirely disregarding the "duty to discover" could we conclude that Catrone was not on "notice" of the alleged wrongs resulting from the 1974 special report and the 1978 newsletter.

We conclude as a matter of law, therefore, that the alleged wrongs occasioned Catrone by the 1974 special report and the 1978 newsletter were either known or readily "knowable" well in advance of May 15, 1983, as Catrone was on notice that appellees, by communicating allegedly defamatory information to state racing commissions and TRA-member tracks,[7] were continuing their longstanding campaign to ban Catrone from racing.

*Remaining Reports*

Catrone advances two contentions relating to the four remaining communications on which he bases his defamation and intentional interference claims. First, Catrone argues that a 1981 summary report[8] and a 1984 incident report were not privileged, since these communications contained stale information and were not solicited by their non-TRA member recipients, Suffolk Downs Raceway and the Massachusetts Racing Commission, respectively. Second, Catrone maintains that appellees abused and forfeited any conditional privilege in the remaining communications be-

cause it was reckless to publish these reports, as well as two others—a 1985 incident report disclosed to the New Hampshire Racing Commission and a 1988 incident report disclosed to officials at Calder Race Track in Florida involving allegations that Catrone wrongfully attempted to enter restricted areas at Calder.

*Conditional Privilege*

■ A defamatory communication is protected by a conditional common law privilege provided the publisher and recipient share some legitimate mutual interest "reasonably calculated" to be served by the communication. *Sheehan v. Tobin*, 326 Mass. 185, 93 N.E.2d 524, 528 (1950); *see also Bratt v. International Business Machines Corp.*, 392 Mass. 508, 467 N.E.2d 126, 131 (1984). The conditional privilege likewise protects the publisher from claims for intentional interference in advantageous business relationships. *See Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 429 N.E.2d 21, 24 (1981); *A.F.M. Corp. v. Corporate Aircraft Management*, 626 F.Supp. 1533, 1551–1552 (D.Mass.1985). The privilege represents an attempt to balance "the interest of the defamed person in the protection of his reputation [and advantageous business relationships] against the interests of the publisher, of third persons and of the public in having the publication take place." Restatement (Second) of Torts § 595 (1977); *see Bratt*, 467 N.E.2d at 131; *Flotech, Inc. v. E.I. Du Pont de Nemours & Co.*, 814 F.2d 775, 779 (1st Cir.1987). As it is designed to promote "the free flow of information to further a legitimate private or public interest," *Bratt*, 467 N.E.2d at 132, n. 11; *Flotech*, 814 F.2d at 779, the conditional privilege is forfeit if abused in furtherance of an illegitimate interest, *Sheehan*, 93 N.E.2d at 528; *Tosti v. Ayik*,

7. For similar reasons, Catrone's claims based on the distribution of a special report index, not distributed after 1980, are barred. The index, which Catrone concedes was widely distributed, merely identified Catrone as the subject of a special report.

8. The 1981 summary report was not produced. For present purposes, however, there is no dis-

pute that the information contained in the 1981 summary report was similar to that contained in a 1983 summary report as concerns events occurring on or before September 16, 1981. The lengthy 1983 summary report principally relates allegations about Catrone's underworld connections and the running of "ringers."

386 Mass. 721, 437 N.E.2d 1062, 1065 (1982).

Catrone contends that according common law privilege to the 1981 summary report and the 1984 incident report would allow a defamer unilaterally to define the universe in which defamatory statements can be communicated with impunity, without regard to the interest of the defamed person, since neither Suffolk Downs nor the Massachusetts Racing Commission was a TRA member and neither report was requested by the recipient. Catrone argues, therefore, that the conditional privilege should only cover communications made under contract.

 Under Massachusetts law, on the other hand, the scope of the conditional privilege is coterminous with the legitimate mutual interest reasonably calculated to be served by the communication. *Sheehan*, 93 N.E.2d at 528. Suffolk Downs, though a non-TRA track, plainly shared appellees' legitimate *private* interest in the dissemination of information concerning matters which might threaten the integrity of thoroughbred racing in Massachusetts. Moreover, as the district court correctly intimated, *see Catrone*, 727 F.Supp. at 725, the free flow of this information served not only a mutual *private* interest in the integrity of thoroughbred racing but the parallel *public* interest in effective enforcement of the police power delegated to the Massachusetts Racing Commission, *see* Mass.G.L. ch. 128A §§ 1–31 (1987).

The district court correctly concluded that the 1981 summary report and the 1984 incident report were protected by common law privilege.[9]

*Stale Information*

Catrone contends that the 1981 summary report and the 1984 incident report were outside the scope of any conditional privilege, due to their inclusion of stale information concerning Catrone's alleged association with organized crime figures and his alleged involvement in the running of "ringers" in the late 1960's and early 1970's. *See, e.g., supra* note 5. Catrone emphasizes that appellees' dissemination of stale information contravened TRA's own policy, as well as the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA"),[10] which should be considered tantamount to public and private policy statements that there can be no social utility in the dissemination of information more than seven years old. *But cf. Bratt*, 467 N.E.2d at 131 (relying on Restatement (Second) of Torts § 594, comment e, at 265 (1977), which states: "in determining whether an interest *not given direct legal protection* warrants protection by conditional privilege, courts should weigh [the] publisher's interest in the defamatory matter, should it be true, against harm to plaintiff's reputation by disclosure of false information.") (emphasis added).

 The scope of the common law privilege is not circumscribed by TRA policy, the FCRA or Mass.G.L. ch. 93 §§ 50–67, the very similar Massachusetts credit reporting statute. On the contrary, the FCRA and the MCRA proscribe the publication of most information more than seven years old,[11] without regard to its truth or the legitimacy and mutuality of the interests reasonably calculated to be served by the information. Instead, these statutes establish rights and remedies narrowly tailored to strike a proper balance between the protections due individuals wronged by *stale credit* reports and the business interests of publishers and recipients of *stale*

---

9. The alternative contention that these reports are not privileged because their distribution violated TRA policy simply recasts Catrone's claim that these publications abused the privilege, the matter to which we now turn. On the other hand, the *scope* of the conditional privilege, as we have stated, is circumscribed by the legitimate public and private interests the communications are reasonably calculated to serve.

10. We need not decide whether the FCRA's seven-year staleness rule applies to appellees, as appellees concede the matter for present purposes. We likewise assume, without deciding, that the Massachusetts counterpart to the FCRA, Mass.G.L. ch. 93 §§ 50–67 ("MCRA"), would apply as well.

11. *But cf.* 15 U.S.C. § 1681c; Mass.G.L. ch. 93 § 52.

*credit* reports.[12]

We can discern no indication that either statute was designed to displace parallel common law rights and remedies, particularly the conditional common law privilege accorded defamatory communications, rather than simply establish an independent statutory remedy. *See* 15 U.S.C. § 1681t; Mass.G.L. ch. 93 § 64. Moreover, Catrone presents no plausible argument that the common law privilege is inconsistent with the FCRA or the MCRA except in an action brought under these statutes.[13]

We will not accept so tenuous an invitation to dismantle the longstanding common law doctrine of conditional privilege under Massachusetts law. *See, e.g., Carlton v. Worcester Ins. Co.*, 923 F.2d 1, 3 (1st Cir. 1991) (litigants in federal diversity action should not expect "new [state-law] trails [to] be blazed"), quoting *Ryan v. Royal Ins. Co.*, 916 F.2d 731, 744 (1st Cir.1990); *Porter v. Nutter*, 913 F.2d 37, 40–41 (1st Cir.1990) (federal court sitting in diversity unwilling to be "adventurous" in interpretation of state law). Accordingly, we hold that the remaining reports were privileged under Massachusetts common law without regard to whether the reports contravened the seven-year staleness standard for the violation of which independent statutory remedies are authorized under the FCRA and the MCRA. *Cf. Bratt*, 467 N.E.2d at 135–136 (SJC refuses to engraft common law conditional privilege onto statutory standards applicable in actions under Massachusetts privacy statute).

*Abuse of Privilege*

■ The common law privilege is "conditioned upon the manner in which the privilege is exercised." *Sheehan*, 93 N.E.2d at 528, quoting Restatement of Torts § 599, comment a. The privilege may be abused either through "unnecessary, unreasonable or excessive publication of the defamatory matter" or by publishing defamatory infor-

mation with "actual malice." *See, e.g., Galvin v. New York, N.H. & H.R. Co.*, 341 Mass. 293, 168 N.E.2d 262, 265–266 (1960), and cases cited. In either event, "[t]he policy reasons behind the recognition of a conditional privilege [have] impel[led Massachusetts courts] to conclude that whatever the manner of abuse, recklessness, at least, should be required" before the privilege is considered forfeit. *Bratt*, 467 N.E.2d at 132.

On motion for summary judgment, the plaintiff bears the burden of establishing abuse of the conditional privilege, *see Anderson*, 477 U.S. at 244, 106 S.Ct. at 2508, by "clear and convincing" evidence, *Petition of Retailers Commercial Agency, Inc.*, 342 Mass. 515, 174 N.E.2d 376, 379 (1961). Catrone insists that there is sufficient evidence of ill will to permit a jury reasonably to infer that all four reports under consideration were published with actual malice. He further contends that two of these four publications were mere pretenses for publishing stale information aimed at banning Catrone from racing. Finally, Catrone maintains that all four reports contain false statements made with reckless disregard for their truth or falsity, if not with actual ill will.

Summary judgment was not appropriate if a jury reasonably could have found that Catrone demonstrated "actual malice by clear and convincing evidence...." *Flotech*, at 780–781, quoting *Anderson*, 477 U.S. at 255–256, 106 S.Ct. at 2513–14. Although summary judgment is to be used sparingly when intent or motive is at issue, *see, e.g., Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 477, 82 S.Ct. 486, 493, 7 L.Ed.2d 458 (1962); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 895 (1st Cir.1988), we nevertheless conclude that the present record does not raise a genuine dispute on the issue of actual malice.

---

**12.** Each credit reporting statute prescribes a two-year limitations period for commencing a private cause of action, *see* 15 U.S.C. § 1681p; Mass.G.L. ch. 93 § 65, and authorizes awards of actual and punitive damages for willful violations, *see* 15 U.S.C. § 1681n; Mass.G.L. ch. 93

§ 63, and actual damages for negligent violations, *see* 15 U.S.C. § 1681o; Mass.G.L. ch. 93 § 64.

**13.** Catrone does not assert a claim under either credit reporting statute.

A genuine dispute as to whether appellees were motivated by ill will toward Catrone is not necessarily trialworthy, as ill will, without more, is insufficient to establish "actual malice," which need "have nothing to do with ill will in the conventional sense," *Boston Mut. Life Ins. Co. v. Varone*, 303 F.2d 155, 159 (1st Cir.1962). "Actual malice," in the context of conditional privilege, entails "an intent to do an act which goes beyond, or lies outside, the purpose of the privilege." *Id.* The Supreme Judicial Court holds that the "sole test is not whether there was malevolence, ill will or hatred but whether there was an abuse of the privilege...." *Sheehan*, 93 N.E.2d at 530.

Even assuming the appellees harbored ill will, therefore, it remained for Catrone to establish that these communications were motivated by "actual malice," in the sense that the communications were designed to serve some purpose "beyond[ ] or ... outside the purpose of the privilege." *Varone*, 303 F.2d at 159. "[I]f the *motivating* force for the publication is shown not to be ill will, its existence is immaterial. Incidental gratification of personal feelings is irrelevant." *Id.* (emphasis added). Although Catrone insists that appellees were motivated by ill will, he presented the district court with no "concrete evidence from which a reasonable juror could return a verdict in his favor...." *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514.

The conditional privilege embraces communications reasonably calculated to advance a legitimate public or private interest common to publisher and recipient. *Sheehan*, 93 N.E.2d at 528. "In order to determine whether there was any abuse of the privilege [appellees] undoubtedly enjoyed, it becomes necessary to consider how far this privilege extended." *Id.* at 529. The privilege is abused if "defamatory matter is published for some purpose other than that for which the particular privilege is given," *id.*, quoting Restatement of Torts § 599, comment a, as when the communicative occasion is used "as a pretense," *Ezekiel v. Jones Motor Co.*, 374 Mass. 382, 372 N.E.2d 1281, 1287 (1978);

*see also Remington v. Congdon*, 2 Pick. (19 Mass.) 310, 315 (1824).

Catrone argues that two of the reports—the 1981 summary report to Suffolk Downs and the 1984 incident report to the Massachusetts Racing Commission—were mere "pretenses" for disseminating defamatory information aimed at banning Catrone from racing. Catrone states that the 1981 summary report was distributed to Suffolk Downs almost immediately after he was relicensed by the Commonwealth of Massachusetts and that the report resulted in his being banned by Suffolk Downs, the only thoroughbred track in Massachusetts. He argues that the 1984 incident report contained a "trivial" allegation that he entered a horse which had been on the "vet's list," which appellees used as a pretext for reporting other defamatory information to the Racing Commission.

The 1981 summary report and the 1984 incident report were reasonably calculated to further the legitimate mutual interests of Suffolk Downs, the Massachusetts Racing Commission, and the appellees, in protecting the integrity of thoroughbred racing in Massachusetts. Since Catrone produced no evidence that the 1981 summary report and the 1984 incident report were motivated by anything other than a "firm belief" that Catrone was bad for racing, *see Hartmann v. Boston Herald–Traveler Corp.*, 323 Mass. 56, 80 N.E.2d 16 (1948) (forceful criticism, based on a "firm belief" that plaintiff was harmful to country, does not demonstrate "improper motive"), and there is no evidence that the published statements were outside, or went beyond, the scope of the protection afforded by the privilege, there was no evidentiary basis for inferring that the statements were "mere pretenses" or that their publication was motivated by "actual malice." Therefore, any defamatory content did not remove these communications beyond the scope of the privilege.

Catrone finally asserts that appellees abused the privilege by publishing the four reports with reckless disregard for their truth or falsity, as evidenced by the fact

that the reports contain minor inconsistencies, as well as statements attributed to unidentified informants.[14] In order to prevail against the motion for summary judgment on the issue of abuse of the privilege, Catrone must demonstrate a trialworthy dispute as to whether appellees' statements were published either without a reasonable basis for forming a belief in their truth, or with actual knowledge of their falsity. *Sheehan,* 93 N.E.2d at 529; *Foley v. Polaroid Corp.,* 400 Mass. 82, 508 N.E.2d 72, 79 (1987). "There is no social utility in reports that are made recklessly or without reasonable grounds." *Retailers Commercial Agency,* 174 N.E.2d at 380.

On the contrary, for the most part these reports are based on documentary evidence and statements attributed to identified witnesses. The minor inconsistencies noted by Catrone may establish, at most, disputes as to the accuracy of the reports, but not a genuine dispute as to the existence of reasonable grounds for a belief in their truth.[15] Mere allegations of wrongdoing on the part of Catrone are identified as such and are not presented as facts. Similarly, the reports reasonably cannot be considered to have lacked sufficient foundation for forming a reasonable belief in their truth simply because some of the statements in the reports were attributed to unidentified informants.[16]

*Judgment affirmed; costs to appellees.*

---

**14.** By contradicting some of the statements in the reports, Catrone's affidavit raises a genuine dispute as to whether the challenged statements were defamatory. On the present motion for summary judgment, however, we assume the statements were defamatory in any event.

**15.** For example, the Protective Bureau alleged that Catrone improperly entered a restricted area at Calder Race Track in 1988 under the assumed name of Patrick Conlran. Catrone calls attention to the fact that the date of birth entered next to Conlran's name was "August 1982." Since Catrone was born more than forty years earlier, he asserts that the Protective Bureau's allegation is inherently implausible. However, the gravamen of the Protective Bureau allegation is that Catrone improperly entered the restricted area after having been told that he was not allowed there, which is supported by the statement of an eyewitness identified in the report. Hence, even if Catrone correctly asserts that the signature of "Patrick Conlran" was not written by Catrone, at best this would raise an issue as to the accuracy of one relatively insignificant basis for the allegation that Catrone entered a prohibited area. Since the eyewitness statement itself was sufficient to support a reasonable belief in the truth of the gravamen of the Protective Bureau allegation, the allegation cannot be considered reckless.

**16.** "Tipster" information was noted as such and, in most instances, there was sufficient independent information to warrant a reasonable belief in the material allegations contained in the report. Furthermore, although the district court ordered the Protective Bureau to disclose the names of the "tipsters," Catrone neither requested a stay of the summary judgment proceedings pending disclosure, *see* Federal Rule of Civil Procedure 56(f), nor does he challenge on appeal the district court's decision to proceed with summary judgment in the absence of a request for stay. Consequently, Catrone can point to no evidence that the "tipster" information relied on by the Protective Bureau was not reliable.