McHugh, J.
BACKGROUND
This is a civil action filed by Clare Sellig (“Sellig”) who claims that she was wrongfully terminated by her employer, Visiting Nurse & Communily Health, Inc. *232 (“VNCH”), (a) in breach of an implied covenant of good faith and fair dealing and (b) in violation of the public policy exception to the general rules of employment-at-will. Sellig also alleges that she was slandered by Maureen Drossos (“Drossos”), a VNCH supervisory employee.
UNDISPUTED FACTS
The Summary Judgment Record, viewed as it must be in the light most favorable to Sellig, establishes that she is a Registered Nurse and a Psychiatric and Mental Health Clinical Specialist. From February 5, 1996 to October 27, 1997, Sellig was an at-will employee of VNCH. VNCH is a nonprofit visiting nurse organization based in Arlington, Massachusetts. In October 1997, VNCH employed Drossos as a “Team Leader.” In that capacity, Drossos was Sellig’s immediate supervisor.
On the morning of Thursday, October 23, 1997, Drossos paged Sellig at the home of a VNCH patient whom Sellig was treating. When Sellig returned her call, Drossos instructed Sellig to come to VNCH headquarters that afternoon to discuss certain issues. Twice Sellig told Drossos that she was not in a position to talk further on the telephone because she was calling from a patient’s home and that the patient needed assistance. Drossos persisted in discussing work-related issues with Sellig who ultimately hung up so she could return to the patient. Promptly after leaving the patient’s home, however, Sellig telephoned Drossos and arranged to attend the meeting Drossos had requested.
At the time Drossos asked Sellig to attend the meeting, VNCH supervisors, including Drossos, were unhappy with Sellig’s work performance, including her refusal to work on weekends and her alleged insubordination to Drossos.[1] Indeed, by the time Drossos requested the meeting with Sellig, VNCH had decided to suspend Sellig for one day and had prepared the appropriate paperwork to do so.
Sellig met with Drossos at the appointed hour. Also present were Eveline Wheeler (“Wheeler”), VNCH’s Human Resources Director and Christine Dixon (“Dixon”), VNCH’s Clinical Manager. Drossos told Sellig that she was expected to work weekends. Drossos also told Sellig that she was to receive a written warning and was to be suspended the following day, Friday, October 24, 1997, for hanging up on her that day and for refusing to work weekends. Drossos also told Sellig that she should call VNCH on the following Monday to set up another meeting before returning to work after her one-day suspension. After hearing Drossos’s last statement, Sellig refused to accept the written warning, stood up and walked out, with words to the effect of “I’ll be back Monday with my attorney.” The meeting had lasted between 10 and 15 minutes.
At her deposition, Wheeler testified that immediately following the meeting, she, Drossos and Dixon decided to terminate Sellig’s employment based on her behavior at the meeting and to try to contact her with that information as soon as possible. However, Wheeler’s memo to the file regarding the meeting, which she prepared late that Thursday after the termination decision allegedly had been made, makes no mention of the termination decision. At her deposition, Dixon did not recall making any decision to terminate Sellig that Thursday. Finally, Drossos prepared a detailed three-page memo late that Thursday describing the events of the day involving Sellig. That memo also made no mention of a decision to terminate Sellig’s employment. Drossos brought her memo to work the next morning and showed it to Dixon so that Dixon could “add onto it anything [Drossos] may have forgotten.” Dixon added handwritten comments to the memo, none of which mentioned a decision to terminate Sellig’s employment.
On the morning of Friday, October 24, 1997, Drossos approached Carol O’Regan (“O’Regan”), a VNCH Human Resource employee, and told her that she should send a warning letter to Sellig. Drossos mentioned nothing about a termination decision. O’Regan prepared and sent a certified letter to Sellig which enclosed a copy of the written warning and a one-day suspension. In her letter, O’Regan stated that “[d]ue to the fact that you refused to take any paperwork, as well as your abrupt exit from the meeting, I am forwarding to you the written description of your warning and suspension. Eveline Wheeler will be in contact with you on Monday, October 27, 1997 to set up the follow-up meeting.” O’Regan’s letter was mailed on Friday morning, around 10:00 or 11:00 a.m.[2]
At approximately 2:47 p.m. that Friday afternoon, Scott A. Lathrop, Esq. (“Lathrop”), an attorney retained by and acting on behalf of Sellig, faxed a letter to VNCH indicating that Sellig wished to convey “her sincere desire to work with your Agency to resolve any issues that may be outstanding and also to clarify expectations and obligations relative to weekend assignments and assignments to cover fields of nursing other than those in which [she] is trained.” Lathrop also stated that ”[i]n yesterday’s abbreviated meeting there apparently was some discussion about meeting next week for further discussion ... I am planning to be at that meeting, not to be a ‘threatening’ lawyer, but to act as a facilitator to assist [Sellig] in receiving any constructive criticism without personalizing it.”
Sometime after O’Regan sent the certified letter to Sellig, Wheeler told O’Regan that Sellig was going to be fired for refusing to work weekends and for insubordination. The record does not clearly reveal when in relation to VNCH’s receipt of the fax from Lathrop that conversation took place. Within an hour or two of VNCH’s receipt of the Lathrop fax, however, Geoffrey Wermuth, Esq., telephoned Lathrop, identified himself as VNCH’s attorney and stated that Sellig should not *233 return to work on Monday, October 27, 1997, because Sellig had been terminated.
After VNCH received the Lathrop fax, Drossos met with Linda Caliga (“Caliga”), VNCH’s Chief Executive Officer. Caliga instructed Drossos to tell the weekend charge nurses that if Sellig was to come into the building, they needed to ask her to leave; ifSelligwould not leave, they needed to call the police.
Sometime after 3:00 p.m., Drossos told Cheryl Ventola (“Ventola”), who frequently served as the charge nurse on weekends, that if Sellig came into the office that weekend, Ventola was to ask her to leave; if Sellig would not leave, Ventola was to call the police. Ventola informed Drossos that she was not the charge nurse that coming weekend. Drossos told Ventola that the information regarding Sellig was very confidential and that Drossos expected it to stay that way. Ventola responded that she understood.
Shortly thereafter, after confirming that Lucy Watson was to be the charge nurse that coming weekend, Drossos gave her the same instructions and warned her that it was to be kept very confidential. Watson asked if Sellig had been fired; Drossos told her that it was a confidential matter and that she could not discuss it. Watson asked if she, Watson, was in any danger. Drossos replied “No. I do not feel Clare is an unreasonable person, and I don’t even foresee anything happening. I just need to let you know what to do in case it does.” Drossos had no other conversations in regard to Sellig being banned from the premises of VNCH.
On Monday, October 27, 1997, Wheeler sent Sellig a letter in which she stated that Sellig’s employment at VNCH “has been terminated effective today Monday, October 27, 1997.” That same day Wheeler created another memo to the file which stated that she had called Sellig on that afternoon “regarding the status of her employment” and that Sellig had returned her call. The memo stated that “(t]hese calls followed on the tails of a letter form [sic] her attorney received on Friday Oct. 24th stating Clare thought we could work things out and that she intended to return to work on Monday, Oct. 27th and a response to that letter from our attorney stating in fact Clare was not to report to work and that we would be contacting her concerning her employment on Monday, Oct. 27th." During the phone call, Sellig asked Wheeler why she had been fired. Wheeler said: “Insubordination.” That same day, Drossos filled out a Personnel Action Form for Sellig which listed her termination date as “10/27/97.”
The foregoing recitation of undisputed facts contains many gaps. Those gaps exist because the recollections of the witnesses differ with respect to events that took place and the sequence in which f lose events occurred from the conclusion of the Thursday meeting to the termination notice communicated to Sellig’s attorney Friday afternoon.[3] When all inferences with respect to those events are drawn in Sellig’s favor, however, there arises[4] a genuine issue of material fact regarding whether or not she was fired because VNCH learned that she had consulted a lawyer who wrote a letter saying that he wished to attend the Monday meeting.
DISCUSSION
As stated earlier, Sellig makes three claims. The first two center on her contention that she was discharged for consulting a lawyer who sent VNCH a letter, a claim as to which there is a genuine issue of material fact. Sellig alleges that discharge for that reason violates the “covenant of good faith and fair dealing” that is a part of every Massachusetts contract and that it violates public policy. Sellig’s final claim is a claim against Drossos for defamation and arises out of the instructions Drossos gave VNCH employees regarding what they should do if Sellig returned over the weekend.
A. Breach of an Implied Covenant of Good Faith and Fair Dealing
The implied covenant of good faith and fair dealing as applied to at-will employees is breached “[w]here the principal seeks to deprive the agent of all compensation by terminating the contractual relationship when the agent is on the brink of completing a sale” or “where the principal attempts to deprive the agent of any portion of a commission due the agent.” Fortune v. Nat’l Cash Register, 373 Mass. 96, 104-05 (1977). See also Kravetz v. Merchants Distribs., 387 Mass. 457, 463 (1982); Gram v. Liberty Mut. Ins. Co., 384 Mass. 659, 672-73 (1981). The cause of action cannot be grounded on lost wages or expected compensation. Gram v. Liberty Mut. Ins. Co., 391 Mass. 333, 334-35 (1984); Kravetz, 387 Mass. at 463; Maddaloni v. Western Mass. Bus Lines, Inc., 386 Mass. 877, 884 (1982); Gram, 384 Mass. at 672. Moreover, the covenant has not been applied to other, noneconomic aspects of the employer-employee relationship. Accordingly, where there is no evidence of compensation denied for work performed, a plaintiff has failed to prove a breach of the covenant. King v. Driscoll, 424 Mass. 1, 7 (1996).
In this case, there is not even the slightest suggestion in the Summary Judgment Record that Sellig was denied compensation for work performed. In the absence of any genuine issue of material fact on that score, VNCH is entitled to summary judgment as far as Count I alleges a breach of an implied covenant of good faith and fair dealing.
B. Violation of the Public Policy Exception to the General Rule of Employment-At-Will
The general rule is that an employer may terminate an at-will employee at any time for any reason, or no reason at all. Upton v. JWP Businessland, 425 Mass. 756, 757 (1997); Jackson v. Action for Boston Community Dev., Inc., 403 Mass. 8, 9 (1988). A narrow exception to this rule exists where the employee can demonstrate that she was terminated in violation of a *234 “clearly established public policy.” Upton, 425 Mass. at 757. See also DeRose v. Putnam Mgt. Co., 398 Mass. 205, 210 (1986). “The public policy exception makes redress available to employees who are terminated for asserting a legal right (e.g., filing a workers’ compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to disobey the law (e.g., refusing to commit perjury).” Upton, 425 Mass. at 757, citing Smith-Pfeffer v. Superintendent of the Walter E. Fernald State School, 404 Mass. 145, 149-50 (1989). The exception also has been held to apply where an employee cooperates with a law enforcement agency in a criminal investigation of the employer, Flesner v. Technical Comm. Corp., 410 Mass. 805, 810 (1991), where an employee attempts to enforce safety laws which she has a duty to enforce, Hobson v. McLean Hosp. Corp., 402 Mass. 413, 416 (1988), and where an employee reports criminal wrongdoing to individuals within the company, Shea v. Emmanuel College, 425 Mass. 761, 763 (1997).
None of the above cases precisely governs this case. Sellig claims that public policy does not countenance discharging an employee simply because the employee has consulted a lawyer about his or her rights and the lawyer has informed the employer of his or her desire to attend a meeting with the employer and the employee. For that proposition, Sellig relies most heavily on Thompto v. Coborn’s, Inc., 871 F.Sup. 1097 (N.D.Iowa 1994). There the court, exercising its diversify jurisdiction and applying Iowa law, held that an at-will employee could not be discharged for “threatening to ‘get a lawyer’ — that is, to consult a lawyer— concerning a dispute with an employer.” Id. at 1116. After examining the aspirational purposes of the Ethical Considerations of the Code of Professional Responsibility and Canons of Judicial Ethics (1970), decisions of the United States Supreme Court, and other authorities, the court concluded that “consultation with a lawyer is so fundamental to our system of justice that an employer’s discharge of an employee for consulting a lawyer would violate public policy.” Id. at 1121. The court further held that “(i]f public policy is not violated by terminating an employee simply for threatening to consult an attorney to vindicate what the employee believes to be his or her rights against an employer, then an employer will be able effectively to deter or sabotage an employee’s effort to enforce those rights." Id.
Other jurisdictions have held that the right of an at-will employee to consult an attorney also protects her right to have that attorney communicate with her employer or another party on her behalf. In Chapman v. Adia Services, Inc., 688 N.E.2d 604 (Ohio Ct. App. 1997), for example, Chapman was terminated after her attorney sent a letter of inquiry to a client of her employer, at whose workplace she was injured; the court concluded that “(t]he courthouse door must be open to the people of Ohio, and they may enter without fear of being deprived of their livelihood . . . Although a juiy may or may not find the facts to be as [a plaintiff] alleges, or may find an overriding justification for her termination, she is entitled to have her case heard.” Id. at 606. See also Simonelli v. Anderson Concrete Co., 650 N.E.2d 488, 492 (Ohio Ct. App. 1994) (Simonelli was terminated after her attorney sent a fax to her employer, demanding that a written warning be removed from her file; the court ruled that “the act of firing an employee for consulting an attorney could serve as the basis for a public policy exception to the common-law employment-at-will doctrine”).
The primary case to which VNCH points is King v. Driscoll, 418 Mass. 576 (1994), in which the Supreme Judicial Court held that an employer could terminate an employee who sued the company in a shareholder derivative action. Although such actions are specifically authorized by G.L.c. 156B, §46, “it is not necessarily true that the existence of a statute relating to a particular matter is by itself a pronouncement of public policy that will protect, in every instance, an employee from termination.” Id. at 584. VNCH claims that if King could be terminated, so can Sellig.
But King, in addition to some of the cases from other jurisdictions VNCH cites,[5] is distinguishable because Sellig did not file suit against VNCH. Once the lawyer begins to act, the employer may be required to divert resources from other areas to meet what the lawyer has done. The fact of that diversion may constitute a perfectly proper basis for a discharge decision.[6] Indeed, Thompto itself distinguished cases in which an at-will employee sued her employer from the “extremely narrow set of circumstances" in which she is discharged for stating an intention to consult an attorney concerning a dispute with her employer. 871 F.Sup. at 1117-19.
VNCH does cite cases in which a court ruled that an at-will employee could be terminated for consulting an attorney who then contacted the employer on her behalf. E.g., Beam v. IPCO Corp., 838 F.2d 242, 247 (7th Cir. 1988).[7] In Beam however, the employee disclosed to the attorney some of the employer’s confidential financial information. No such disclosure took place here. More important, the court in Beam perhaps believing itself confined by principles underlying exercise of diversity jurisdiction, took an extremely narrow and mechanical view of the scope of Wisconsin’s public policy limitation on the broad rights of an at-will employer. In so doing, the court touched on none of the issues central to the decision in Thompto and that omission results in an opinion that is, on the whole, unpersuasive.
Massachusetts law, like the law of Ohio, recognizes the importance of consultation with counsel. See, e.g., Mass. Const., Pt. 1, Art. XI (“Every subject of the commonwealth ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, properly, or character”); Matter of John Doe Grand Jury Investiga *235 tion, 408 Mass. 480, 481-82 (1990), quoting Hunt v. Blackburn, 128 U.S. 464, 470 (1888) (“The rule which places the seal of secrecy upon communications between client and attorney is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure”). That recognition always has been a fundamental part of our jurisprudence. Indeed in 1833, the Supreme Judicial Court put the matter in this fashion:
[S]o numerous and complex are the laws by which the rights and duties of citizens are governed, so important is it that they should be permitted to avail themselves of the superior skill and learning of those who are sanctioned by the law as its miñisters and expounders, both in ascertaining their rights in the country, and maintaining them most safely in courts . . . that the law has considered it the wisest policy to encourage and sanction [confidential communications between attorney and client], by requiring that on such [communications] the mouth of the attorney shall be for ever sealed.
Hatton v. Robinson, 14 Pick. 416, 422 (1833).
We are and always have been a law-based society. We deeply and fundamentally believe in the rule of law and in using law to resolve an almost endless variety of social problems. We also believe in using law and the legal process to set standards to which human behavior must conform and to allocate rights and obligations to those who often have antagonistic interests. But many — indeed, perhaps most — people are unfamiliar with the source and content of the law applicable to problems they face from time. The explanatory and interpretive role lawyers play thus is essential if the principles of law we collectively have spent so much effort to create are to be something other than shadowy illusions drifting through obfuscating mists. Allowing employers to discharge employees simply because the latter consult with those whose knowledge is essential to an understanding of their rights and obligations would turn the act of seeking to learn one’s rights into a switch that extinguished them all. Countenancing such a result is wholly inconsistent with the public policy of a just — or even of a sane — legal order.
To be sure, there is some risk that prohibiting discharge because of consultation with a lawyer will lead everyone threatened with discharge to consult, or at least say they intend to consult, with a lawyer and in the process complicate substantially the process of separating the permissible from the im permissible ingredients of what the employer does thereafter. The overwhelming majority of cases, however, will not become unduly cluttered. The few that do simply represent the unavoidable and unintended consequence of transforming the theoretical law of the workplace into practical worksite tools.[8]
C. Defamation
Sellig alleges that the statements Drossos made about her on Friday, October 24, 1997 to Ventola and Watson were defamatory. Drossos responds that the statements were not defamatory, and even if they were, they were protected by a conditional privilege. “Defamation is the publication of material... without the privilege to do so which ridicules or treats the plaintiff with contempt.” Correllas v. Vivieros, 410 Mass. 314, 319 (1991). See also Merrill v. Post Publishing Co., 197 Mass. 185, 191-92 (1908). To prove a claim for defamation, therefore, a plaintiff must prove: (a) a false and defamatory statement concerning another, (b) an unprivileged publication to a third parly although the burden of proving privilege may sometimes be on the defendant, (c) fault amounting at least to negligence on the part of the publisher, and in some cases, (d) the existence of special harm caused by the publication. Restatement (Second) of Torts §558. See also McAvoy v. Shufrin, 401 Mass. 593, 597-98 (1988).
The test of whether a publication is defamatory is whether, in the circumstances, the words discredit the plaintiff in the minds of any considerable and respectable segment in the community. Draghetti v. Chmielewski, 416 Mass. 808, 811 (1994). Where a communication is susceptible of both a defamatory and nondefamatory meaning, a question of fact exists for the jury. Jones v. Taibbi, 400 Mass. 786, 792 (1987). Statements that could be reasonably understood to mean that there was evidence that Sellig intended to commit a crime when there was no such evidence are defamatory per se. Draghetti, 416 Mass. at 812; Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 853 (1975). Statements that prejudice someone in her profession or business or may probably have tended to do so are also defamatory per se. Lynch v. Lyons, 303 Mass. 116, 118-19 (1939).
On this record, Drossos had no evidence that Sellig intended to commit a crime. But Drossos’s statements to Ventola and Watson could not reasonably have been understood that she did. Instead, they were conditional imperatives — if this happens, then you should do this. Further, if Sellig entered upon the property of VNCH and refused to leave after having been forbidden to do so by a person in lawful control of the premises, she would be committing a crime, which would justify the summoning of the police. G.L.c. 266, §120. Drossos’s instruction to Watson also was accompanied by a statement that Drossos did not believe that Sellig was actually dangerous. Finally, there is no evidence in the record that Drossos’s statements prejudiced Sellig in her profession or business or may have tended to do so.
In addition, Massachusetts courts recognize that a defamation defendant may be shielded from liability by a conditional privilege to publish defamatory mate *236 rial. If so, the defendant is entitled to summary judgment. Catrone v. Thoroughbred Racing Ass’n of N. Am., 929 F.2d 881, 887-88 (1st Cir. 1991). The privilege exists where both the publisher and recipient of a communication “share some legitimate mutual interest ‘reasonably calculated’ to be served by the communication.” Id. at 887, citing Sheehan v. Tobin, 326 Mass. 185, 191 (1950). A business interest qualifies as a legitimate interest for purposes of the privilege. Bratt v. Int'l Business Machines Corp., 392 Mass. 508, 512-13 (1984). See also McCone v. New England Tel. & Tel Co., 393 Mass. 231, 235-36 (1984).
Once a defendant has established that his or her statement is conditionally privileged, the burden of proof shifts to the plaintiff to demonstrate abuse of that privilege. Landry v. Mier, 921 F.Sup. 880, 888 (D.Mass. 1996). See also Sheehan, 326 Mass. at 191-92; Bander v. Metropolitan Life Ins. Co., 313 Mass. 337, 343 (1943).
An employer has an interest in keeping trespassers off its premises, including but not limited to suspended employees, especially given that an employer may have some legal obligations to protect its employees from workplace threats and troubles. See generally Foley v. Boston Housing Auth., 407 Mass. 640, 644 (1990). Further, in order to carry out its obligations, a property owner must have the power to ensure that those in lawful control of the premises forbid interlopers from remaining on the properly. G.L.c 266, §120. In this case, Drossos merely carried instructions to that effect from the Chief Executive Officer of VNCH to parties that Drossos believed or were authorized to act on behalf of VNCH. Com. v. Wolf, 34Mass.App.Ct. 949, 949 (1993).
To be sure, a conditional privilege may be lost if it is abused. A “privilege may be abused either through ‘unnecessary, unreasonable or excessive publication of the defamatory matter’ or by publishing defamatory information with ‘actual malice.’ ” Catrone, 929 F.2d at 889.[9] The privilege also may be lost if publication is made with knowledge that the statements were false or with a reckless disregard for truth or falsity. A.F.M. Corp. v. Corporate Aircraft Mgt., 626 F.Sup. 1533, 1552 (D.Mass. 1985). See also Bratt, 392 Mass. at 514; Ezekiel v. Jones Motor Co., Inc., 374 Mass. 382, 390-91 (1978).
Even if the statements Drossos made were defamatory, the record establishes, without genuine issue of material fact, her privilege to make them. There likewise is no genuine issue of material fact regarding abuse of the privilege. Drossos made no statement to anyone other than Ventola and Watson. She made the statement to Ventola when she believed that Ventola was the weekend charge nurse and thus would require the information to carry out her duties. When Ventola told her otherwise, Drossos confirmed that Watson was the weekend charge nurse prior to talking to her about Sellig. Finally, there is not even the slightest suggestion in the record that Drossos spoke out of malice, or with knowledge that her statements were false or with a reckless disregard for their truth or falsity.
ORDER
In light of the foregoing, it is hereby ORDERED that Defendants’ Motion for Summary Judgment should be, and it hereby is, ALLOWED insofar as Plaintiffs claims for breach of an implied covenant of good faith and fair dealing and defamation are concerned and is otherwise DENIED.

 Sellig contends that VNCH understood when it hired her that she was unavailable on weekends and that VNCH hired her with that understanding.

 Wheeler testified that she told Linda Caliga, VNCH’s CEO, of the termination decision on Thursday evening. O’Regan testified that Caliga told her the following morning simply to send out the suspension material and that she learned from Wheeler of the discharge decision sometime after she had mailed that material. Caliga apparently was not deposed.

 The process of determining the undisputed facts also has been complicated by plaintiffs election to dispense with the response required by Superior Court Rule 9A(b)(5).

 Use of the word “arises” has perhaps too much of an affirmative ring in this context. Plaintiff claims, inter alia, that she was fired for consulting with an attorney. Defendants have the initial burden of showing that there is no genuine issue of material fact regarding the causes of her discharge. Kourouvacilis v. General Motors Corp., 410 Mass. 706 (1991). If they satisfy that burden, then the plaintiff has the burden of demonstrating affirmatively that a genuine issue of material fact does indeed exist. Id. Until defendants satisfy their burden, however, plaintiff has no burden at all. Smith v. Massimiano, 414 Mass. 81, 85-86 (1993). Agenuine issue of material fact “arises” in this case because defendants have not carried their initial burden of showing its nonexistence.

 Deiters v. Home Depot U.S.A., Inc., 842 F.Sup. 1023, 1028-29 (M.D.Tenn. 1993); Whitman v. Schlumberger Ltd., 793 F.Sup. 228, 232 (N.D.Cal. 1992); Watson v. Peoples Sec. Life Ins. Co., 588 A.2d 760, 765-66 (Md. 1991); and cases cited.

 That, of course, is one risk a proper consultation between lawyer and employee can reveal so that the employee can thereafter act in an informed fashion.

 VNCH also relies on Tynes v. Shoney’s, Inc., 867 F.Sup. 330, 334 (D.Md. 1994), but there the employee was discharged for threatening to file a criminal assault and battery charge against a supervisor as a consequence of a workplace dispute.

 Sometimes there also will be difficulties in determining whether the employer’s response is in response to the employee's consultation with a lawyer or because of what the lawyer did after the consultation. Precisely where the line in that regard should be drawn is not clear but, given the resource-diversion issue discussed in the text, probably does not require the employer to do much more than receive the lawyer’s first communication. There is no line-drawing problem here, however, because VNCH asserts that it made the discharge decision before it learned that Sellig had consulted anyone.

 This form of malice must be distinguished from constitutional malice discussed in New York Times v. Sullivan, 376 U.S. 254 (1964), and its progeny.