NICHOLAS P. PACELLA *vs*. MILFORD RADIO CORPORATION
& another.[1]

Worcester. December 8, 1983. — April 17, 1984.

Present: GRANT, DREBEN, & SMITH, JJ.

*Libel and Slander. Constitutional Law,* Freedom of speech and press, Libel
and slander. *Practice, Civil,* Judgment notwithstanding verdict.

In an action by a candidate in a local election, against the operator of a radio
station and its employee, the moderator of a radio "talk show," seeking
damages for allegedly defamatory statements made by an anonymous
telephone caller during a broadcast devoted to the election, the plaintiff
did not meet his burden of proving by clear and convincing evidence
that the defendants had broadcast the statements with knowledge that
they were false or with reckless disregard of whether they were false or
not. [10-16]

In the context of an election "talk show" conducted by a radio station employ-
ee equipped with an electronic delay device which afforded him seven
seconds to decide whether to prevent any statement from being broadcast,
the employee had no duty to prevent the broadcast of an anonymous
telephone caller's allegedly defamatory statements concerning one of
the candidates in the election, where it was not shown that the employee
was aware of the probable falsity of the statement. [13-14]

CIVIL ACTION commenced in the Superior Court on February
22, 1977.

The case was tried before *Rutledge,* J., and a motion for
judgment notwithstanding the verdict was heard by him.

*David A. Mills* for the plaintiff.

*William J. LeDoux* for the defendants.

DREBEN, J.   In 1975 Nicholas P. Pacella was a candidate
for the Milford board of selectmen. On the day before the
election, an anonymous caller telephoned the corporate de-
fendant's radio station and made certain defamatory remarks

---

[1] Joseph G. Hyder.

directed against Pacella on a talk show devoted to the election. Although an electronic delay system gave the defendant Joseph G. Hyder, the talk show's host, a seven-second preview of the caller's question and an opportunity to prevent its broadcast, he did not use the abort button. Pacella lost the election and, in this libel action, sued Hyder and the corporate defendant, the former employer of Hyder. A Superior Court jury assessed $15,000 damages against the defendants, but the trial judge allowed the defendants' motion for judgment notwithstanding the verdict. We affirm on the ground that Pacella, a public figure, did not meet his burden of proving by clear and convincing evidence that the defendants published the caller's statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 280 (1964). *National Assn. of Govt. Employees, Inc.* v. *Central Bdcst. Corp.,* 379 Mass. 220, 230-231 (1979), cert. denied 446 U.S. 935 (1980).

We turn to the facts, considered in the light most favorable to the plaintiff.[2] The five candidates for the Milford board of selectmen were invited by radio station WMRC to appear on the station's "Counterpoint" talk show on May 6, 1975, for an hour-long program concerning the election. Hyder explained the proposed format to Pacella — statements by the candidates were to be followed by a question and answer session with the station's call-in audience. Pacella, a school teacher with inflexible hours, decided not to appear in person but to submit a taped statement. He expressed uneasiness about the question

---

[2] This standard has been applied by the Supreme Judicial Court in summary judgment defamation cases. *National Assn. of Govt. Employees, Inc.,* 379 Mass. at 231. *Lyons* v. *New Mass Media, Inc.,* 390 Mass. 51, 52 (1983). *Aarco, Inc.* v. *Baynes,* 391 Mass. 560, 564 (1984). We see no reason to apply a different rule to a motion for judgment n.o.v. See *Stone* v. *Essex County Newspapers, Inc.,* 367 Mass. 849, 880 (1975) (Quirico, J., dissenting). The appellate role in these libel cases, however, "requires careful appellate review of the facts," and we must "examine for ourselves" the whole record to see whether the statements in their context are of a character which the First Amendment protects. *Cole* v. *Westinghouse Bdcst. Co.,* 386 Mass. 303, 308, cert. denied, 459 U.S. 1037 (1982), quoting from *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 285 (1964).

and answer format but was assured by Hyder that there would be no problems, Hyder stating, "How can they ask you questions if you are not here?"

Nevertheless, at the time of the actual broadcast, Hyder and an anonymous caller to "Counterpoint" had the following interchange during the question period following the candidates' statements:

> CALLER: "I have a question for Mr. Pacella."
>
> HYDER: "Mr. Fernandez is here. Mr. Pacella was on tape recording earlier. He was not present."
>
> CALLER: "So I can't ask a question of him?"
>
> HYDER: "He's not here to answer. How can you possibly do that, dear? [sic] If you can tell me how, I'll be happy to relay the question."
>
> CALLER: "Well, could I ask the question and you can relay it to him?"
>
> HYDER: "Well, ah, by the time we get an answer the elections will be over. Rhetorically, if you want to ask it, go ahead."
>
> CALLER: "Pardon?"
>
> HYDER: "Go ahead."
>
> FERNANDEZ: "Maybe I could answer for him."
>
> HYDER: "Yeah. Go ahead, ask the question."
>
> CALLER: "All right. He is represented by the Concerned Citizens, and their motto is, 'The people have a right to know,' which I agree with. Especially when the integrity of a candidate is in doubt. My question is: Did you, Mr. Pacella, during the construction of your home, ever take without authority certain building materials from the construction site? And were you brought in for questioning by the Milford Police and let go because the owner wouldn't press charges? That is my question."

At this point, Hyder decided to terminate the call and stated: "Uh huh? Well I suggest you contact Mr. Pacella tonight

when he comes home from his job, alright?"[3] Later in the program, Pacella's wife and one of his supporters responded, calling the charge vicious, upsetting, and untrue. Hyder concluded his conversation by thanking Mrs. Pacella as set forth in the margin.[4]

Although the defendants at trial introduced evidence as to the truth of the construction site story, referred to as the "Grant Street rumor," the jury found otherwise.[5] There was also evidence that the rumor had persistence and had been heard by several persons. Pacella testified that he had heard the story several times, first in 1962 or 1963, again in 1974 and once again in 1975 prior to the broadcast. He had discussed it with some of his campaign workers and his campaign manager. Although concerned about the rumor, Pacella never alerted Hyder to the possibility that it might surface. Lawrence Shane, the former manager of the station (deceased at the time of trial), indicated, in a deposition read to the jury, that he also had been aware of the rumor.

Hyder testified that he had heard the Grant Street story some five or six years before the broadcast in a "social context" and that at that time he had no personal knowledge whether the rumor was true. Seena Heller,[6] the mother of Pacella's campaign manager and a strong supporter, testified that Hyder, who had called Heller some seven weeks before the broadcast on an unrelated matter, had referred to Pacella as a "crook."[7]

---

[3] Hyder's last remark was not included in the transcript but is referred to by the plaintiff in his brief and noted by the defendants. The remark also appears on an exhibit attached to the complaint.

[4] "Mrs. Pacella, thank you so much for calling. I'm glad that you were able to clarify it for us, and I think that somebody has taken advantage of the opportunity, the fact that your husband was not here to reply, and I think that you've handled it very nicely."

[5] The incident that gave rise to the rumor took place in 1962. There was conflicting testimony at trial. A policeman, who by the time of trial had become chief of police of Milford, testified that he had observed Pacella removing bricks from a construction site on Grant Street. Pacella claimed he had not taken the bricks, but had taken a board which he had paid for.

[6] Seena Heller was chairman of Milford's planning board and known to Hyder as the wife of his daughter's podiatrist.

[7] Hyder denied the statement.

At that time she informed him that the rumor was unequivocally false, cautioned him against repeating it, and suggested that he discuss the matter with Pacella. Hyder testified that he did not use the abort button on May 6, 1975, and that he intentionally allowed the call to be broadcast because he believed that the public has the right to know about a candidate. He also testified that the seven seconds were sufficient time for him to exercise that judgment.

Pacella claims that he has carried his burden of proving with convincing clarity that Hyder published the statement with "reckless disregard" of its truth and relies on the following evidence: Hyder had dismissed the rumor when he had first heard it; the source of the statement was anonymous and hence unreliable; Seena Heller ardently denied the truth of the statement; Hyder's own knowledge of Pacella made the statement improbable; Hyder acknowledged that he had had enough time to exercise judgment and that he intentionally broadcast the statement because of the public's right to know about the candidate; Hyder, at a time after the broadcast, stated he had published it "for effect." We think none of these factors, whether taken separately or in unison, shows the requisite "reckless disregard" to impose liability on Hyder for failing to censor the statement.

We start, as we must, with *New York Times Co.* v. *Sullivan,* 376 U.S. 254 (1964). There, the Supreme Court announced a rule, designed to insure "that debate on public issues . . . be uninhibited, robust, and wide-open," which "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 270, 279-280. His proof must be "clear and convincing." *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323, 342 (1974). *Callahan* v. *Westinghouse Bdcst. Co.,* 372 Mass. 582, 583 (1977).

Several matters need not concern us. Pacella concedes, as he must, that as a candidate for public office he and the subject matter of the discussion are within the rule. "[P]ublications

concerning candidates must be accorded at least as much pro-
tection under the First and Fourteenth Amendments as those
concerning occupants of public office." *Monitor Patriot Co.*
v. *Roy,* 401 U.S. 265, 271 (1971). "Few personal attributes
are more germane to fitness for office than dishonesty." *Gertz*
v. *Robert Welch, Inc.,* 418 U.S. at 345. "[T]he constitutional
guarantee has its fullest and most urgent application precisely
to the conduct of campaigns for political office." *Monitor Pat-
riot Co.* v. *Roy, supra* at 272.

While the caller's statement was in interrogatory form, we
do not lay particular stress on that fact and, at least for purposes
of this opinion, assume that the remarks imputed a crime to
Pacella and hence were defamatory per se.[8] *Lynch* v. *Lyons,*
303 Mass. 116, 118-119 (1939). *Stone* v. *Essex County News-
papers, Inc.,* 367 Mass. 849, 853 (1975). Those remarks were
found by the jury to be false, and the defendants do not contend
otherwise.

Our review of the record indicates that there was no evidence
that Hyder had actual knowledge that the rumor was false.
Thus, the crucial question is whether Hyder acted "with reckless
disregard[9] of whether it was false or not." Cases sub-

[8] Defendants would have us draw a line between an inquiry about an
accusation circulating in the community (as they characterize the call) and
an accusation in itself.

[9] "Reckless disregard" has been variously described. In *Garrison* v.
*Louisiana,* 379 U.S. 64, 74 (1964), it was said that sanctions could be
imposed only for statements "made with the high degree of awareness of
their probable falsity demanded by [the *New York Times* case]." A case
much cited, *St. Amant* v. *Thompson,* 390 U.S. 727, 730-731 (1968),
suggests that while "[r]eckless disregard . . . cannot be fully encompassed
in one infallible definition," it requires that there "be sufficient evidence
to permit the conclusion that the defendant in fact entertained serious doubts
as to the truth of his publication." See *Stone* v. *Essex County Newspapers,
Inc.,* 367 Mass. at 867; *Lyons* v. *New Mass Media, Inc.,* 390 Mass. 51,
57 (1983). In *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323, 334 n.6 (1974),
the Court quoting the passage previously cited from *St. Amant,* explained,
"In [*St. Amant*], the Court equated reckless disregard of the truth with
subjective awareness of probable falsity." See also *Herbert* v. *Lando,* 441
U.S. 153, 160 (1979) (alleged defamer "must know or have reason to
suspect that his publication is false"). In Massachusetts see *National Assn.
of Govt. Employees, Inc.* v. *Central Bdcst. Corp.,* 379 Mass. at 232 ("mor-
dant unconcern with the truth of the particular statement").

sequent to the *New York Times* case have made clear that the
test is a subjective one,[10] and that the plaintiff must focus on
the "conduct and state of mind of the defendant." *Herbert* v.
*Lando,* 441 U.S. 153, 160 (1979). The circumstances in which
the statement is made are, of course, significant in determining
whether recklessness may be found (see *Cole* v. *Westinghouse
Bdcst. Co.,* 386 Mass. 303, 309, cert. denied, 459 U.S. 1037
[1982]), an assessment which also involves whether such a
finding would intrude in a "forbidden" manner on the "field
of free expression." *New York Times Co.* v. *Sullivan,* 376 U.S.
at 285. See *Stone* v. *Essex County Newspapers, Inc.,* 367
Mass. at 855.

Of particular importance here is "the medium by which the
statement is disseminated and the audience to which it is pub-
lished." *Cole* v. *Westinghouse Bdcst. Co.,* 386 Mass. at 309,
quoting from *Information Control Corp.* v. *Genesis One Com-
puter Corp.,* 611 F.2d 781, 784 (9th Cir. 1980). The defendants
organized a program concerning an upcoming election, asked
the candidates to present statements, and afforded the public
the opportunity to question the candidates freely. Neither Hyder
nor the station had any power to restrict or censor the material
presented by the candidates. This is because the United States
Supreme Court, relying on the public interest in "full and unre-
stricted" political discussion, has held in unmistakable terms[11] that

---

[10] *St. Amant* v. *Thompson,* 390 U.S. at 732. *Stone* v. *Essex County
Newspapers, Inc.,* 367 Mass. at 867-869. *National Assn. of Govt. Employ-
ees, Inc.* v. *Central Bdcst. Corp.,* 379 Mass. at 232.

[11] "The decision a broadcasting station would have to make in censoring
libelous discussion by a candidate is far from easy. Whether a statement is
defamatory is rarely clear. Whether such a statement is actionably libelous
is an even more complex question, involving as it does, consideration of
various legal defenses such as "truth" and the privilege of fair comment.
Such issues have always troubled courts. Yet, under petitioner's view of
the statute they would have to be resolved by an individual licensee during
the stress of a political campaign, often, necessarily, without adequate
consideration or basis for decision. Quite possibly, if a station were held
responsible for the broadcast of libelous material, all remarks even faintly
objectionable would be excluded out of an excess of caution. Moreover, if
any censorship were permissible, a station so inclined could intentionally
inhibit a candidate's legitimate presentation under the guise of lawful censor-

47 U.S.C. § 315(a) (1976)[12] prevents a broadcaster from deleting libelous statements of candidates and that radio stations are immune from liability for broadcasting such statements. *Farmers Educ. & Co-op. Union* v. *WDAY, Inc.,* 360 U.S. 525, 530-531 (1959). See also G. L. c. 231, § 91A.

It is readily apparent that caution must be exercised before imposing liability on Hyder for insufficient use of the abort button lest the "robust and wide-open debate" protected by *New York Times* be inhibited in a substantial way. This consideration was emphasized in *Adams* v. *Frontier Bdcst. Co.,* 555 P.2d 556 (Wyo. 1976), where the Supreme Court of Wyoming ruled that the decision of a radio station not to use an electronic delay system in connection with a talk show did not constitute "reckless disregard" under the *New York Times* rule. The station was held not liable for broadcasting a defamatory falsehood made by an anonymous caller. See also *Demman* v. *Star Bdcst. Co.,* 28 Utah 2d 50, 53 (1972), where the Supreme Court of Utah reached the same result. Contra *Snowden* v. *Pearl River Bdcst. Corp.,* 251 So.2d 405, 410 (La. App. 1971).

The court in *Adams* also noted, "The impact of the censorship would not fall upon the broadcaster's words and ideas; instead, it would be applied to the opinions and ideas of those members of the public who elected to participate in this kind of public forum." 555 P.2d at 567. See also *New York Times Co.,* 376 U.S. at 266, where the Supreme Court pointed out the dangers of shutting off "an important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities — who wish to exercise their freedom of speech even though they are not members of the press."

---

ship of libelous matter. Because of the time limitation inherent in a political campaign, erroneous decisions by a station could not be corrected by the courts promptly enough to permit the candidate to bring improperly excluded matter before the public. It follows from all this that allowing censorship, even of the attenuated type advocated here, would almost inevitably force a candidate to avoid controversial issues during political debates over radio and television, and hence restrict the coverage of consideration relevant to intelligent political decision." 360 U.S. at 530-531.

[12] Section 315(a) has subsequently been amended, but those amendments are not here relevant.

Unlike the commercial advertisement in *New York Times* which can be checked for accuracy prior to publication, a statement called into a talk show can not be verified within the seven seconds afforded by electronic equipment. See *National Assn. of Govt. Employees, Inc.,* 379 Mass. at 224 n.4, where the court refers to the Wyoming *Adams* case. In determining "reckless disregard," "the amount of time necessary and available for checking the accuracy of [a] story" is, of course, relevant. *Stone* v. *Essex County Newspapers, Inc.,* 367 Mass. at 869. See *Curtis Publishing Co.* v. *Butts,* 388 U.S. 130, 157, 158-159 (1967) (hot news). See also *Priestley* v. *Hastings & Sons Publishing Co.,* 360 Mass. 118, 123-125 (1971).

Moreover, the role of a talk-show host differs from that of a reporter or newscaster. His function is not to discover the news but to moderate the public debate. "It is one thing to require a newspaper to check the accuracy of an interview. But it may be another matter to hold a TV newsperson responsible for the spontaneous live utterance of an interviewee." *Jones* v. *Taibbi,* 508 F. Supp. 1069, 1074-1075 n.12 (D. Mass.); cert. denied 454 U.S. 1085 (1981). To impose on the talk-show host a duty of private censorship[13] whenever he has an insufficient basis for assessing the truth of a statement would surely result in the extinction of the public talk show.

We now return to Pacella's claims that there is here sufficient evidence to prove with convincing clarity that Hyder published the statement with "reckless disregard" of its truth. Pacella is correct that an anonymous call carries less reliability than one from an identified source. A story "based wholly on an unverified anonymous telephone call" is one of the instances in *St. Amant* v. *Thompson,* 390 U.S. at 732, where the Supreme Court indicated "[p]rofessions of good faith will be unlikely to prove persuasive." However, sole reliance on an anonymous

---

[13] The term "censorship" connotes "all factors which would inhibit the freedom and spontaneity of the public dialogue." *Adams* v. *Frontier Bdcst. Co.,* 555 P.2d at 565. See *New York Times,* 376 U.S. at 277 (fear of damage awards "may be markedly more inhibiting than the fear of prosecution under a criminal statute").

telephone tip in a context where there is time to check it out is quite different from receiving a call on a talk show where there is no such time. Even if the talk-show host were to require identification, a caller on a talk show (unlike the tipster whose identity could later be verified) could easily adopt an assumed name and the host would be none the wiser. We think the lack of identification, although undesirable, is not enough.

The fact that Seena Heller denied the truth of the statement is likewise not dispositive. In the climate of a campaign all kinds of allegations abound.[14] "[L]iability under the 'clear and convincing proof' standard . . . cannot be predicated on mere denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Edwards* v. *National Audubon Soc., Inc.,* 556 F.2d 113, 121 (2d Cir.), cert. denied sub nom. *Edwards* v. *New York Times Co.,* 434 U.S. 1002 (1977). *Colombo* v. *Times-Argus Assn.,* 135 Vt. 454, 458 (1977).

There was no evidence that Hyder knew Pacella personally. Compare *Stone* v. *Essex County Newspapers, Inc.,* 367 Mass. at 869. He had met him once, knew that he was a teacher and a family man, and that he had held town offices. Certainly such knowledge did not make the allegation "inherently improbable." *St. Amant,* 390 U.S. at 732.

Hyder's own statement that he had enough time to decide to publish based on his view that the public had the right to know does not, in any way, indicate recklessness, but only intentional publication. See *St. Amant* v. *Thompson,* 390 U.S. at 733. His other alleged statement that he published the call "for effect" does not approach a showing of malice in the con-

---

[14] See Noel, Defamation of Public Officers and Candidates, 49 Col. L. Rev. 875 (1949) ("Charges of gross incompetence, disregard of the public interest, communist sympathies, and the like have usually filled the air; and hints of bribery, embezzlement, and other criminal conduct are not infrequent. If actionable defamation is possible in this field, one might suppose the chief energies of the courts, for some time after every political campaign, would be absorbed by libel and slander suits."). Noel was cited by *New York Times,* 376 U.S. at 273 n.14, and by *Monitor Patriot Co.* v. *Roy,* 401 U.S. at 274 n.4.

stitutional sense. Bad motive or hostility is not what is meant by malice in the *New York Times* sense. *National Assn. of Govt. Employees, Inc.* v. *Central Bdcst. Corp.,* 379 Mass. at 232. *Beckley Newspapers Corp.* v. *Hanks,* 389 U.S. 81, 82 (1967) (per curiam).

In sum, we conclude that there has been no showing by "clear and convincing proof," that Hyder permitted the statement to be broadcast "with reckless disregard of whether it was false or not," a standard which, in this context, requires at least that Hyder be aware of the "probable falsity" of the caller's remarks.[15] See *Gertz* v *Robert Welch, Inc.,* 418 U.S. at 334 n.6. See also cases cited at note 9, *supra.* The trial judge was correct in allowing the defendants' motion.

*Judgment affirmed.*

---

[15] To the extent that there may be an ambiguity in some opinions suggesting that "serious doubt" as to the truth of a statement differs from awareness of the "probable falsity" of a statement, we think that in the context of a talk show covering an election, where there is neither time for reasoned judgment nor for verification, the ambiguity should be resolved in favor of permitting the broadcast of an outside call. We repeat that *Gertz* takes the position there is no distinction in these formulations. See note 9, *supra.* See also *Adams* v. *Frontier Bdcst. Co.,* 555 P.2d at 564 n.5.