McHugh, J.
I. BACKGROUND
In this action alleging defamation (Counts I and II), invasion of privacy (Count III), intentional infliction of emotional distress (Count IV), violation of the Massachusetts Civil Rights Act (Count V), intentional interference with contractual and advantageous relations (Count VI), violation of the Massachusetts Personnel Records Act (Count VII) and loss of consortium (Count VIII), Defendants have moved for summary judgment on all counts pursuant to Mass.R.Civ.P. 56.
Plaintiff Lawrence E. McNulty (“McNulty”) was, at all material times, the principal of the ActonBoxborough Regional High School. Defendant Robert E. Kessler (“Kessler”) was, at those times, the School Superintendent. Defendant Gary G. Baker (“Baker”) was an Assistant Superintendent and reported to Kessler. Baker was McNulty’s immediate superior. Defendant Patricia Haras (“Haras”) was a secretary in McNulty’s office. Finally, Defendant Donald A. MacLeod (“MacLeod”) was an assistant Acton-Boxborough principal.
McNulty alleges that Kessler made certain libelous and slanderous statements concerning McNulty’s relationship with his secretary, Mrs. Therese Sliwa (“Sliwa”). According to McNulty, the statements at issue were contained in a letter Kessler authored, were made by Kessler in meetings with various school employees and were made by implication when Kessler imposed on McNulty a one-day suspension for “managerial shortcomings.” McNulty also alleges that Haras defamed him when, in response to an inquiry from Kessler, she said that McNulty and Sliwa were behaving in a way that made her think the two were having an affair and by keeping a log showing dates and times when Haras claims McNulty and Sliwa left the high school together during school hours. McNulty claims that Baker’s interviews with faculty members, in which Baker allegedly asked questions about the relationship between McNulty and Sliwa, were slanderous. Finally, McNulty claims that MacLeod defamed him by telling Kessler and others that McNulty was having an affair with Sliwa.
II. FACTS
A. GENERAL BACKGROUND
McNulty was appointed to the position of Principal of the Acton-Boxborough High School in 1973. Throughout his tenure, or at least during the periods material to this action, he reported to Baker directly and indirectly to Kessler. MacLeod was, at all material times, a vice principal at the high school and reported to McNulty. McNulty was well known in the community and was in general highly regarded.
B. BAKER’S CHRONOLOGY
Throughout his tenure before 1990, McNulty received generally positive performance reviews and the step salary increases to which he was presumptively entitled. In the Spring of 1989, however, Baker told Kessler that he had “serious concern” about McNulty’s continued service as school superintendent. Kessler asked Baker to document his concerns in writing. Baker responded with a memorandum detailing difficulties he had had with McNulty over an eight-year period. Baker’s memorandum concluded:
In sum, the above references show a pattern that is consistent with Bill Ryan’s comments that [McNulty] lacks integrity and is often defiant. I would add that sometimes he is just not as effective or efficient in carrying out his responsibilities. He has strengths that have been mentioned in his evaluations, but the cumulative problems I’ve listed, which are far in excess of any other principal I supervise, amount to a serious concern that I have with him as a principal in our school system.
Baker’s memorandum was dated April 28, 1989.[3] Kessler accepted the memorandum and read it but took no action on it.
C.THE INCIDENT OF AUGUST 24, 1990
From May of 1989 through October of 1990, the Acton-Boxborough school underwent a comprehensive review as part of the New England Association of Schools and Colleges (the “Association”) accreditation process. As part of the review, an Association visiting committee asked school faculty members to respond to a confidential survey. When the results of the survey were tabulated in June 1990, they revealed that 43% of the faculty members questioned McNulty’s “fairness and openness” in dealing with school staff. Indeed, before the final results were tabulated, McNulty received a telephone call from the Chair of the Visiting Committee during which she stated that in all of her years of conducting school reviews she had never seen anything like the strength and breadth of the criticism of McNulty the confidential faculty questionnaires revealed. In the end, although the Association found *459 much positive to say about the school, its final report was, at least in part, very critical of McNulty and said that he had lost the trust and confidence of a significant part of the staff. Baker’s subsequent annual review of McNulty drew upon the Association’s conclusions and was itself critical of McNulty.
Up to this point, the relations between the parties, while manifesting some serious problems, presented nothing an observer of large and evolving organizations would be surprised to encounter. Matters took a bizarre twist, however, on August 24, 1990. Although the parties do not fully agree on all details, the essence is quite clear.
On August 24, McNulty left his office in the company of Sliwa, his secretary, in Sliwa’s car. As will be seen in a minute, the nature of the relationship between McNulty and Sliwa had been a topic on which at least some school employees had been focussing for some time. Indeed, in late September, McNulty himself told Kessler that rumors about his relationship to Sliwa “were running rampant in the school system, ” although it is possible that, by then, the rumors had gathered energy as a result of the August 24 incident itself.
In any event, MacLeod, apparently believing that McNulty and Sliwa were having an affair,[4] decided to “catch” them together outside the school.[5] He therefore left the building, got into his car and drove to Sliwa’s house about one and one-half miles away. There he parked outside, apparently in plain view, and waited. At some point, McNulty returned to the school alone.[6] After his return, Sliwa telephoned to say that MacLeod was sitting outside. McNulty thereupon got in his car, drove to Sliwa’s house and tried to persuade MacLeod to leave. MacLeod refused. Somehow, the Acton police became involved and ultimately MacLeod left.
Kessler found out about the incident two days later when McNulty telephoned him to report it. Kessler thereafter met with McNulty, MacLeod and Sliwa and obtained from them their accounts of the incident. Shortly thereafter, apparently in an effort to place MacLeod’s conduct in context, Haras visited Kessler to say that for some time she had been keeping a record of the occasions on which Sliwa and McNully left the school office and returned at approximately the same time during school hours. In substance and effect, Haras told Kessler that she thought McNulty and Sliwa were having an affair.
Later, Kessler interviewed Pat Motyka and Barbara Oldenburg, two other secretaries in McNulty’s office. During the course of his interviews, he asked both whether they thought that McNulty and Sliwa were having an affair. Both responded essentially in the affirmative and provided Kessler with the basis for their beliefs.[7]
D.KESSLER’S SEPTEMBER 11, 1990 LETTER
After finishing the foregoing interviews, Kessler summoned McNulty to a meeting on September 11, 1990. Present, in addition to McNulty and Kessler, were Baker, Director of Personnel Malcolm Reid and Vice Principal Fran Riley.[8] During the course of the meeting, Kessler presented McNulty with a letter stating that it was perceived at the high school that McNulty’s relationship with Sliwa was too intimate, and directing McNulty to act in a way as to avoid further such perceptions.[9] Later that day, Kessler suspended McNulty for one day for “managerial shortcomings” in connection with the way he had handled the August 24 incident and placed MacLeod on an indefinite leave of absence for his participation in the event, with a suggestion that he would not be returning to the school.
E.KESSLER’S SEPTEMBER 11, 1990
MEETINGS WITH SCHOOL SYSTEM ADMINISTRATORS
After placing MacLeod on a leave of absence and suspending McNulty for a day, Kessler called three meetings to inform high school administrators and department chairpersons, junior high school department heads, and elementary school principals about the incident and about his response to it. At those meetings, Kessler stated, in substance or effect, that there was a “very negative situation at the high school involving MacLeod, Sliwa, and McNulty,” that McNulty had been suspended for one day for managerial shortcomings and that MacLeod had been suspended indefinitely. Kessler told McNulty in advance what he was going to say and McNulty asked him to say nothing. Kessler responded that saying nothing was not an option and gave him three options concerning the language he would use to describe the matter. McNulty chose the option that Kessler in fact employed.
A short time thereafter, several high-school department heads visited Kessler to tell him that they were concerned about such things as McNulty’s alleged sexist language, intimidating behavior, preferential treatment for some, lack of “openness” at the school and other matters. The department heads stated that they represented a much larger group of faculty members. Kessler told them that he would look into their claims.
F.PUBLICATION OF HARAS’ LOGS
In November, Haras provided Kessler with a “log” indicating 43 occasions on which McNulty and Sliwa had been out of the office at the same time during school hours beginning in August of 1989, almost a full year before the August 24, 1990 incident. In response, Kessler asked McNulty and Sliwa for their calendars. After receiving what he perceived to be an unsatisfactory response to his request, Kessler asked McNulty to attend a meeting on January 3, 1991 at which he asked McNulty whether he was aware of the contents of Haras’ “log,” and whether he could explain them. The meeting was also attended by Reid, Riley and Coordinator of Computer Services James Chase. *460 McNulty claims that Kessler “published” what McNulty contends were the implicitly defamatory contents of Haras’ “log” when he asked questions about them at that meeting.
G.CLAIMS AGAINST HARAS
McNulty claims that Haras defamed him in two ways: First, by publishing her “log” to Kessler and, second, by expressing her belief to Kessler that McNulty and Sliwa were having an affair.
H.BAKER INTERVIEWS
The final report of the Visiting Committee of the New England Association of Schools and Colleges was presented to the School Committee on February 7, 1991. By this time, in addition to the incident at Sliwa’s house and its aftermath, Kessler had seen a November 28, 1990 memorandum from department heads to McNulty that strongly criticized, albeit in the form of suggestions for change, the manner in which he had been running the school.
After receiving the report on February 7, the School Committee told Kessler to investigate the report’s conclusions with respect to McNulty’s deficient performance and report back as soon as possible. To that end, Kessler directed Baker and two other school administrators to interview all school faculty members and report the results of the interviews to him. To facilitate the interviews, Kessler prepared a questionnaire the interviewers were to use. One question said “Is there anything else you want to tell me about [McNulty’s] leadership?” During the course of the interviews, Baker obtained responses indicating that at least some faculty members thought that McNulty and Sliwa were having an affair.[10] McNulty contends that Baker’s questions to those he interviewed about whether they believed McNulty was having an affair and his inclusion in the report he ultimately prepared of faculty beliefs on that subject were defamatory.
I.DENOUEMENT
Baker and the other interviewers ultimately presented their findings to Kessler. Between March and May of 1991, Kessler reprimanded McNulty for his handling of two separate problems, one between a teacher and a student and the other between a teacher and a department head. On July 23, 1991, Kessler told McNully that he was going to recommend to the School Committee that he not be reappointed to his position. In fact, Kessler made that recommendation. The School Committee ultimately held hearings on the matter at which 86 witnesses, including 25% of the high school faculty, testified. After the hearing, the Committee voted to dismiss McNulty. That vote currently is the subject of a separate suit.
III. APPLICABLE LAW
Until recently, the principles governing summary judgment in Massachusetts were those the Supreme Judicial Court had articulated in Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). Under those principles,
[t]he party moving for summary judgment assumes the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue, even if he [or she] would have no burden on an issue if the case were to go to trial... If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat a motion for summary judgment. (Footnote omitted.)
In the recent case oí Kourouvacilis v. GeneralMotors Corp., 410 Mass. 706 (1991), however, the Court embraced the principles set forth by the Supreme Court of the United States in Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Under those principles,
a party who moves for summary judgment has the burden of initially showing that there is an absence of evidence to support the case of the nonmoving party shouldering the burden of proof at tria.[11] That burden is not sustained by the mere filing of the summary judgment motion or by the filing of a motion together with a statement that the other party has produced no evidence that would prove a particular necessary element of this case. The motion must be supported by one or more of the materials listed in rule 56(c) and, although that supporting material need not negate, that is, disprove, an essential element of the claim of the party on whom the burden of proof at trial will rest, it must demonstrate that proof of that element at trial is unlikely to be forthcoming.
Kourouvacilis, supra, 410 Mass, at 714. As a consequence, there are now two ways in which the party moving for summary judgment may meet the burden imposed by Mass.R.Civ.P. 56. The first of those follows traditional Massachusetts law:
[T]he moving party may submit affirmative evidence that negates an essential element of the nonmoving parly’s claim.
Kourouvacilis, supra, 410 Mass, at 715 quoting Celotex Corp. v. Catrett, supra, 477 U.S. at 331-32 (Brennan, J., dissenting). Second, however,
the moving party may demonstrate to the court that the nonmoving party’s evidence is insufficient to establish an essential element of the nonmoving party’s claim ... If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law . . . Plainly, a conclusory assertion that the non-moving party has no evidence is insufficient . . . Such a “burden” of production is no burden at all and would simply permit summary judgment procedure to be converted into a tool for harassment . . . Rather, ... a party who moves for summary judgment on the ground that the nonmoving party *461 has no evidence must affirmatively show the absence of evidence in the record.

Id.

Put another way,
a party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he [or she] demonstrates, by reference to material described in Mass.R.Civ.P. 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case. To be successful, a moving party need not submit affirmative evidence to negate one or more elements of the other party’s claim.
Kourouvacilis, supra, 410 Mass, at 716.
In applying that standard,
[w]here a moving party properly asserts that there is no genuine issue of material fact, “the judge must ask himself [or herself] not whether he [or she] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). A judge’s mere belief that the movant is more likely to prevail at trial is not a sufficient basis for granting summary judgment.
Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991).
Finally, although the Supreme Judicial Court has stated repeatedly that summary judgment is favored in cases alleging defamation, e.g., Mulgrew v. City of Taunton, 410 Mass. 631, 632 (1991); King v. Globe Newspaper Co., 400 Mass. 705, 708 (1987), cert, denied, 485 U.S. 962 (1988), defendants seeking summary judgment in defamation cases
must still meet the usual burden under rule 56 of demonstrating by evidence “considered with an indulgence in the plaintiffs favor,” the absence of disputed issues of material fact and their entitlement to judgment as a matter of law.
Godbout v. Cousens, 396 Mass. 254, 258 (1985), quoting National Ass’n of Gov’t Employees, Inc. v. Central Broadcasters Corp., 379 Mass. 220, 231 (1979), cert, denied, 446 U.S. 935 (1980).
IV. DISCUSSION
A. COUNTS I AND II: LIBEL AND SLANDER
Defendants have moved for summary judgment both on Count I (Libel) and Count II (Slander), contending that the allegedly defamatory statements are not defamatory and, alternatively, that the defendants are protected by one or more qualified privileges.[12] Many of the statements are defamatory[13] and the record does not eliminate all genuine issues of material fact about their truth.[14] Privilege is therefore, at least for the moment, the real battleground.
1. Constitutional Privileges
Consideration of the privilege issue begins, at the top, with defendant’s claim that McNuliy is a public official for purposes of this action and that summary judgment is therefore appropriate because he has not pointed to a genuine issue of material fact on the question whether the defamatory statements were published with “actual malice,”[15] i.e., at a time when a publishing defendant knew of their falsity or in fact entertained subjective doubt as to their truth, New York Times Co. v . Sullivan, 376 U.S. 254, 280 (1964); St. Amant v. Thompson, 390 U.S. 727, 731 (1968).[16] Where, as here, the facts bearing on the plaintiffs status are uncontested, the question whether plaintiff is a public official is a question of law to be answered by the court. Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 862-63 (1975).[17]
There is no precise and certain formula by which one can in all cases identify public officials to whom the “actual malice” test applies. See generally, e.g., New YorkTimes Co. v. Sullivan, supra, 376 U.S. at 284 n.23. Accordingly, to decide whether a particular plaintiff is a public official, the court must look at whether the person’s position is one that would invite public scrutiny and discussion apart from the scrutiny and discussion brought on by the controversy in question. Stone, 367 Mass at 864, citing Rosenblatt v. Baer, 383 U.S. 75, 86-87 n. 13 (1966). As the Supreme Court put it in Rosenblatt,
[w]here a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, . . . the New York Times malice standard applies.
Rosenblatt, supra, 383 U.S. at 86. The inquiry must be made in the context of “the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.” New York Times Co. v. Sullivan, supra, 376 U.S. at 270.
While there are no Massachusetts cases directly on point, other jurisdictions have concluded that high school principals are public figures; e.g., Kapilqff v. Dunn, 343 A.2d 251, 258 (Md.App.Ct. 1975), cert denied, 426 U.S. 907 (1976) (high school principal is a “public figure-public official”); Junior-Spence v. Keenan, 1990 WL 17241 (Tenn.App. 1990) (high school principal is a public official). But see Ellerbee v. Mills, 422 S.E.2d 539, 540 (Ga. 1992), cert denied, 113 S.Ct. 1833 (1993) (high school principal is not a public official). Indeed, other public school officials have been regarded as public officials as well. See Palmer v. Bennington School District, 615 A.2d 498 (Vt. 1992) (public elementary school principal is a public official); Johnson v. Robbinsdale Independent School *462 District #281, 827 F.Supp. 1439 (D. Minn. 1993) (elementary school principal is public official); Johnston v. Corinthian Television Corp., 583 P.2d 1101 (Okla. 1978) (public high school wrestling coach is a public official).
In the case at bar, the facts concerning McNuliy’s employment and the scope of his duties as high school principal are clear and undisputed. He was the principal of the Acton-Boxborough High School, a large regional high school and had held that position since 1973. The Acton-Boxborough High School was consistently rated among the top schools in Massachusetts having achieved numerous awards and honors and school officials were well-known in the community. While it is unclear from the record how much authority the School Committee and Superintendent had delegated to McNulty, the record contains a sufficient basis for concluding that McNulty was, in fact and appearance, the person in charge of the school’s operation. In sum, McNuliy occupied a position that invited public scrutiny. He was a public official for purposes of commentary about the manner in which he discharged the duties with which he was charged. See Stone v. Essex County Newspapers, Inc., supra, 367 Mass, at 864; Palmer v. Bennington School District, supra, 615 A.2d at 502.[18]
Even if one is a “public official,” the “actual malice” standard does not necessarily apply to all statements made under all circumstances. Cf., e.g., Crane v. Arizona Republic, 972 F.2d 1511, 1524 (9th Cir. 1992); Foster v. Laredo Newspapers, Inc., 541 S.W.2d 809, 814 (1976), cert, denied, 429 U.S. 1123 (1977). Instead, the standard applies only to statements about the official’s performance of public or official duties. New York Times Co. v. Sullivan, supra, 376 U.S. at 279-80. Although the line dividing official and “private” conduct sometimes is difficult to discern, alleged improprieties occurring during the school day and adversely affecting McNulty’s performance of and fitness for his job clearly are matters as to which the “actual malice” standard applies.[19]
Accordingly, in order to avoid summary judgment McNulty must show that there is a genuine issue of material fact with respect to his ability to prove at trial, by clear and convincing proof, that defendants either knew the relevant statements were false when they made them or in fact entertained at the time serious doubts as to their truth. Tosti v. Ayik, 394 Mass. 482, 491-92 (1985), cert, denied, 484 U.S. 964 (1987); St. Amant v. Thompson, supra, 390 U.S. at 731. Although these tests are subjective and sometimes do not readily lend themselves to summary disposition, Hutchinson v. Proxmire, 443 U.S. Ill, 120 n.9 (1979), the nature of the constitutional right to free speech makes the sufficiency of evidence of actual malice a question of law. Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 667 (1989).
In this case, construing the facts in the light most favorable to McNuliy, the record will not support a reasoned conclusion that Kessler, Baker or MacLeod published defamatory statements with knowing or reckless disregard for the truth. Even if the motives McNulty ascribes to them are taken into account,[20] there is no genuine issue of material fact as to whether Kessler, Baker or MacLeod knew that any statement they made was false when they made it or made it at a time when they entertained serious doubt as to its truth.[21] At most, McNuliy has submitted some evidence that all three failed to investigate certain matters sufficiently before they published innuendos that McNulty and Sliwa were having an affair.[22] Even if that is so, however, a failure to investigate merely establishes possible negligence; it does not establish knowledge of a falsehood or serious doubt about the resulting misinformed statement. St. Amant v. Thompson, supra, 390 U.S. at 731; Harte-Hanks Communications v. Connaughton, supra, 491 U.S. at 667.
The fact that Kessler or Baker may have expressed to each other or to others a desire for McNulty’s replacement before much of the negative information regarding McNulty had come to light does not change the result. Even if one might view such thoughts or expressions as “malicious” and not the product of a genuine concern for sound operation of the school, “actual malice” has nothing to do with “malice” as the term is used in common parlance. See n.13, supra There simply is no evidence that Kessler or Baker were subjectively aware that the statements they made regarding McNulty were false and that they made the statements nonetheless.
With Haras, the case is different. On their face, her statements to the effect that she believed McNulty and Sliwa were engaging in romantic departures from school during school hours were statements of opinion based on disclosed facts and thus privileged. Myers v. Boston Magazine, supra, 380 Mass, at 339-40. Her underlying statements about their contemporaneous absence from school, however, are contradicted by McNulty’s assertions that, on many of the reported days, either he or Sliwa or both were there all day or on vacation all day and thus that Haras could not in fact have seen the events she purported to witness. That assertion is sufficient to raise a genuine issue of material fact about whether Haras made knowingly false statements in the “log” she published to Kessler and, if so, whether her asserted opinions were opinions she actually held.
2. Common-Law Privileges
Application of the constitutional privilege resolves all aspects of the libel claim save the claim asserted against Haras. Nevertheless, a brief look at the common-law privilege claims is appropriate so that the next level of protection defendants assert can be assessed even if the first is later stripped away. That *463 analysis yields in some instances slightly different results.
It is well established in the Commonwealth that an employer has a conditional common-law privilege to make defamatoiy statements concerning an employee when the statement is reasonably necessary to serve the employer’s legitimate interest in the fitness of an employee to perform his or her job. E.g., Draghetti v. Chmielewski, 416 Mass. 808, 813 n.3 (1994), citing Bratt v. International Business Machines Corp., 392 Mass. 508 (1984) (memorandum sent from director of personnel to supervisors regarding employee’s mental health protected by conditional privilege); Foley v. Polaroid Corp., 400 Mass. 82, 95 (1987) (statements made by Polaroid executives to other executives and an employee representative about an employee were conditionally privileged). Cor relatively, employees have a corresponding privilege to make false and defamatory statements in response to an employer’s request or to advance the employer and employee’s common interests. See generally Burns v. Barry, 353 Mass. 115, 118-19 (1967); Sheehan v. Tobin, 326 Mass. 185, 190-91 (1950); Catrone v. Thoroughbred Racing Ass’n, 929 F.2d 881, 887 (1st Cir. 1991).
Successful invocation of the privilege requires good faith and at least a reasonable belief in the truth of the information published. See Bratt v. International Business Machines Corp., supra, 392 Mass, at 516-17. The privilege therefore is lost if the publication is made with knowledge of falsity or reckless disregard for truth, Foley v. Polaroid Corp., supra, 400 Mass, at 95-96; Tosti v. Ayik, 386 Mass. 721, 726 (1982), but not if it is published with mere negligence. Bratt v. International Business Machines Corp., supra, 392 Mass, at 515-16. The privilege also is lost if the publication is made with common-law malice, i.e„ hatred or ill-will, e.g. Dexter’s Hearthside Restaurant v. Whitehall, 24 Mass.App.Ct. 217, 223 (1987); Restatement (Second) of Torts §603, comment a, or if it takes the form of an unnecessary, unreasonable, or excessive publication. Bratt v. International Business Machines Corp., supra, 392 Mass, at 515-16. If, however, the privilege applies, prima facie, the plaintiff has the burden of proving that it was lost in one or more of the ways just described. Sheehan v. Tobin, supra, 326 Mass, at 191-92.
In this case, all of the allegedly defamatory statements were made in the course of Kessler’s and Baker’s investigation of Dr. McNulty’s fitness to continue as high school principal and thus are presumptively within the privilege’s sheltered zone. A brief look at each group of statements is therefore appropriate. Application of the common-law privilege, however, necessarily builds on the analysis just concluded because knowledge that any of the published statements was false would be powerful evidence of malice and would itself create a genuine issue of material fact on whether the common-law privilege applied. Mulgrew v. City of Taunton, supra, 410 Mass. 636.
A. Baker’s Memorandum. Baker’s memorandum of April 28, 1989 was true. The incidents, some perhaps trivial but others more serious, had occurred. Baker’s conclusions at the end, even if otherwise actionable as false statements of fact, were, on this record, motivated at most by a desire to replace McNulty with someone else. That is not “malice” that breaks the common-law privilege.
B. Kessler’s September 11, 1990 Letter. The view of the record most favorable to plaintiff suggests that Kessler’s September 11, 1990 letter was published to Baker, McNulty, Director of Personnel Malcolm Reid and Vice Principal Fran Riley. The record does not fully answer the question why it was necessary or appropriate to publish the letter’s content to Reid and Riley. Although one can infer some answers, inferences run against the moving party and that party bears the burden of eliminating all genuine issues of material fact before the other side need pull a laboring oar. Kourouvacilis v. General Motors Corp., supra, 410 Mass, at 714. That burden is one Kessler has not, on the present record, borne. But see Foley v. Polaroid Corp., supra, 400 Mass, at 95.
C. MacLeod’s Statements to Kessler. The motivation for MacLeod’s statements to Kessler about the activities of McNulty and Sliwa is very much at issue and there are, on the present record, genuine issues of material fact as to whether MacLeod made those statements with malice in its customary sense.
D. Kessler’s September 11, 1990 Meetings with Administrators. There is on the present record the same issue as to the extent of Kessler’s publication of the circumstances surrounding McNulty’s suspension as there was concerning the extent of publication of Kessler’s September 11, 1990 letter. See 1IV(B)(2), supra.
E. Haras’ Statements. Because there is a question as to the extent to which Haras knew the contents of her “logs” were untrue, there is a genuine issue of material fact as to whether the common-law, as well as the constitutional, privilege, is applicable to her.
F. Baker’s Interviews. Taking the facts in the light most favorable to McNulty, even if Baker did question faculty members directly about the alleged affair between McNulty and Sliwa, his questions were privileged because they were posed in the course of the ongoing investigation of McNulty’s fitness to continue as high school principal. Baker also had a legitimate interest in discovering whether the rumors about an affair were true because conduct of that type, whether or not carried out during school hours, had a potential impact on the school system, see n. 19, supra, as well as the potential for continuing disruption of the system’s day-to-day operation.
*464 B.COUNT III: INVASION OF PRIVACY
McNulty alleges in Count III that the defendants violated his privacy in two ways: by the scope and what he claims was the intrusive nature of their “investigation,” and by placing McNulty in a false light by preparing and publishing the list of dates and times that he and Sliwa were allegedly out of the office at the same time.
General Laws c. 214, §1B (1988 ed.), the Massachusetts privacy statute, provides that, “[a] person shall have a right against unreasonable, substantial or serious interference with his privacy . . In bringing a claim under this statute, a plaintiff must prove both that the defendant’s actions were unreasonable and that the conduct amounted either to a substantial or serious interference with his privacy. Schlesinger v. Merrill Lynch, Pierce, Fenner, & Smith, Inc., 409 Mass. 514, 517-18 (1991). Although the tort of false light invasion of privacy heretofore has not been heretofore been recognized in Massachusetts, see E.L.M. Medical Laboradory, Inc. v. RKO General, Inc., 403 Mass. 779, 787 (1989); Yovino v. Fish, 27 Mass.App.Ct. 442, 450 (1989), the tort is recognized in the Restatement and is well established elsewhere. Restatement (Second) of Torts §652E; Wood v. Hustler Magazine, 736 F.2d 1084, 1089 (5th Cir. 1984); Lovegrass v. Citizens First Nail Bank, 534 N.E.2d 987, 991 (111. 1989).
To the extent that it alleges an invasion of privacy by false light, plaintiffs claim fails for two reasons. First, Haras’ disclosure of her logs to Kessler and Kessler’s subsequent disclosure of them to McNulty and no more than three others at the January 3 meeting is disclosure to too small a group to meet the “publicity” requirement the tort contains. See Brauer v. Globe Newspaper Company, 351 Mass. 53, 58 (1966). Second, and insofar as the remaining defendants are concerned, a false light claim cannot be used to make an end-run around the constitutional protections afforded defendants in the libel claim. See Hustler Magazine v. Falwell, 485 U.S. 46, 56 (1988). Therefore, at least where public officials are concerned, a false light claim cannot succeed in the absence of clear and convincing proof that the false statements were made with knowledge of their falsity or at a time when the defendants entertained a serious doubt as to their truth. Time, Inc. v. Hill, 385 U.S. 374, 397 (1967); Cantrell v. Forest City Publishing Co., Inc. 419 U.S. 245, 250 (1974).
The other basis of McNulty’s claim for invasion of privacy stems from the defendants’ investigation into the rumors that surrounded McNulty’s alleged activities at the school. Even if constitutional principles did not foreclose the invasion of privacy claim here, defendants’ actions were not “unreasonable” within the meaning of G.L.c. 214 §1B. In determining what invasions of privacy are “unreasonable,” the court must balance privacy interests against the interests served by disclosure. Bratt, supra, 392 Mass, at 520. Here, all of defendants’ disclosures about McNulty occurred in the course of their inquiries or comments about his performance of his duties as principal. Moreover, the subject of each disclosure was limited to matters touching on McNulty’s fitness to serve as high school principal. Neither the investigation nor the disclosures therefore amounted to an unreasonable interference with McNulty’s privacy. See Mulgrew v. City of Taunton, supra, 410 Mass, at 637.
C.COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
In Count IV, McNulty alleges that the statements made linking him to Sliwa were made with intent to inflict severe emotional distress on him or with reckless disregard for the fact that they would inflict severe emotional distress upon him. Under standards set out in Hustler Magazine v. Falwell, supra, 485 U.S. at 56, constitutionally protected speech may not provide the basis for a public official’s claim for intentional infliction of emotional distress. Consequently, the claims of intentional infliction of emotional distress against defendants Kessler and Baker fail along with the First Amendment claims.
As to defendants Haras and MacLeod, these claims cannot be disposed of by summary judgment. Since there remains a genuine factual dispute regarding whether Haras’ statements, her logs, contained knowing falsehoods, and whether the emotional distress suffered by McNulty as a result, if any, was severe, there is a genuine issue of fact as to her liability for intentional infliction of emotional distress. MacLeod has not eliminated all genuine issues of material fact concerning whether his statements were made with “actual malice,” whether his conduct was extreme and outrageous and whether McNulty suffered severe emotional distress as a result. SeeAgis v. Howard Johnson Co., 371 Mass. 140, 144 (1976).
D.COUNTV: VIOLATION OF THE MASSACHUSETTS CIVIL RIGHTS ACT
In Count V, McNulty claims that the actions of defendants Kessler and Baker amounted to “threats, intimidation or coercion” that interfered with his employment and other rights in violation of G.L.c. 12, §§11H and 111, the Massachusetts Civil Rights Act (“MCRA”). In essence, the MCRA extends familiar concepts of civil rights claims to claims against private individuals but eliminates the requirement for state action. To establish a claim under the MCRA, a plaintiff must prove (1) interference, actual or attempted, with exercise or enjoyment of rights secured by the Constitution or laws of the Commonwealth or of the United States and (2) that the interference or attempted interference was effected by threats, intimidation, or coercion. G.L.c. 12, §11H.
Count V cannot survive a motion for summary judgment because the claimed interference came about through speech I have already ruled was itself constitutionally protected. Constitutional dilemmas of *465 the most troubling variety would attend any conclusion that the MCRA was designed to penalize one person’s exercise of constitutional rights if and to the extent that that exercise interfered with exercise by someone else of rights he or she possessed. See generally Redgrave v. Boston Symphony Orchestra, Inc., 855 F.2d 888, 904-06 (1st Cir. 1988); Redgrave v. Boston Symphony Orchestra, Inc., 399 Mass. 93, 97 (1987). But see Karetnikova v. Trustees of Emerson College, 728 F.Supp. 73, 78 (D. Mass. 1989). I therefore do not construe the Act to reach that far. See generally, e.g., Lyons v. Labor Relations Common, 397 Mass. 498, 501-02 (1986). Moreover, to the extent that defendant’s speech was protected, their conduct fell within the discretionary area where public officials can act with impunity. See generally Duarte v. Healy, 405 Mass. 43 (1989).
E.COUNT VI; INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIP
To succeed on Count VI, alleging intentional interference with contractual relations, McNulty must prove 1) the existence of a contract, 2) that the defendants) knowingly interfered with the contract, 3) that the defendant(s) acted with improper motive or improper means, and 4) that the plaintiff was harmed by defendants) actions. Wright v. Sherman Hospital for Crippled Children, 412 Mass. 469, 476 (1992); G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991); United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 812-17 (1990). See generally Owen v. Williams, 322 Mass. 356, 362 (1948).
There is no doubt on the present record that a contract existed between the plaintiff and the school district and that at least two of the defendants, Kessler and Baker, played a substantial role in the termination of this contract. One may assume that damage flowed from the termination.
Insofar as Kessler and Baker are concerned, however, there is no genuine issue of material fact as to improper motive or means. The record suggests — indeed, compels — a conclusion that they both wanted someone else to be the principal. That desire, however, is not in and of itself a bad motive nor, without more, does it evidence a bad motive. The means they used not only were proper, they were constitutionally protected.[23]
As for Haras and MacLeod, the case is different. Insofar as there is a genuine issue of material fact as to whether Haras’s logs, and thus her statements of opinion, contained knowing falsehoods, there is a genuine issue of material fact as to her liability for interference •with McNulty’s contractual relationship. Finally, a jury surely could find that MacLeod’s motives were improper and thus there is a genuine issue of material fact as to all elements of the interference claim against him.
F.COUNT VII: PERSONNEL RECORDS ACT
Neither side has devoted any significant time or energy to the contents of Count VII, alleging a violation of the Personnel Records Act by Kessler and Baker alone. To the extent that time has not mooted the claim,[24] those defendants simply have not carried their initial burden of showing the absence of any genuine issue of material fact, see Kourouvacilis v. General Motors Corp., supra, 410 Mass, at 714, and thus their entitlement to summary judgment.
G.COUNT VIII: LOSS OF CONSORTIUM
This Count, brought on behalf of McNulty’s wife, succeeds or fails to precisely the same extent that McNulty’s own claims succeed or fail. No independent analysis of the claim therefore is necessary.
ORDER
In light of the foregoing, it is hereby ORDERED that defendants’ Motion for Summary Judgment should be, and it hereby is,
1. ALLOWED as to the claims asserted against defendants Baker and Kessler in Count I;
2. ALLOWED as to the claims asserted against defendants Baker and Kessler in Count II;
3. ALLOWED as to Count III;
4. ALLOWED as to the claims asserted against defendants Baker and Kessler in Count IV;
5. ALLOWED as to Count V;
6. ALLOWED as to the claims asserted against defendants Baker and Kessler in Count VI;
7. ALLOWED as to Count VII;
8. ALLOWED as to the claims asserted against defendants Baker and Kessler in Count VIII; and
9. Otherwise DENIED.

Notwithstanding Baker’s rather unhappy assessment, the formal annual evaluation he prepared for McNulty on August 7, 1989, barely three months later, was far less negative in its overall tone.

Earlier, in August of 1987, Sliwa told McNulty that MacLeod had been sexually harassing her. That report was transmitted to Kessler who investigated the matter, suspended MacLeod and required him to undergo some physical and psychological testing. MacLeod later returned to work.

Apparently, MacLeod was not the first school employee to serve as a self-appointed sleuth in this matter. During the ensuing investigation, a teacher named B.J. Davis told Baker that she, too, had seen McNulty and Sliwa leave the school together during school hours and had followed them to Sliwa’s house.

One of the guidance counsellors at the school later told Kessler that McNulty had been “sweating profusely” when she saw him at school that afternoon. Kessler took that observation to be consistent with the possibility that McNulty had seen MacLeod at Sliwa’s and had run all the way back to the school. Other possible explanations, of course, abound.

Oldenburg and Motyka based their beliefs on observations not only of comings and goings but apparently on what Sliwa was wearing as well, for Motyka told Kessler that secretaries would sometimes make bets on whether Sliwa and Kessler would leave school at the same time on a given day based on such things as what Sliwa wore to work.

The parties disagree about who was present during this meeting. Kessler says that he, Baker, McNulty and a union representative McNulty chose were in attendance. McNulty claims that he, Kessler, Baker, Reid and Riley were present and makes no mention of a union representative. For present purposes, I have accepted, as I must, McNulty’s version.

In pertinent part, the letter read as follows:
During my investigation of the recent matter involving you, Therese Sliwa, and Don MacLeod, I became aware that it is perceived, at the High School, that your relationship with Therese is too intimate. You and Therese have represented to me that any such suspicions are untrue (if they were true, of course, it would be an extremely serious matter). Whether or not these perceptions are true, my investigation indicates that you and Therese have engaged in conduct that has given rise to these perceptions.

Baker claims that all of the information on the subject he received came from open-ended and non-suggestive questions. Several interviewees, however, said that Baker specifically asked whether they thought McNulty was having an affair. The present procedural setting therefore requires an assumption that Baker, at least on some occasions, raised the subject of an affair between McNulty and Sliwa.

11Kourouvacilis did not change the proposition that the moving party must show the absence of any genuine issue of material fact before the non-moving party will be required to file any affidavit-based response of any kind. Smith v. Massimiano, 414 Mass. 81, 85-86 (1993).

The difference between libel and slander is, of course, the difference between written and spoken defamation. Insofar as they affect the motion now before the Court, however, the guiding principles are exactly the same.

A statement is defamatory if, when considered in the context surrounding its publication, the statement discredits a person “in the minds of any considerable and respectable class of the community.” Milgroom v. News Group Boston, 412 Mass. 9, 12 (1992). Whether statements are “reasonably susceptible of a defamatory meaning” is a threshold question of law for the court. Foley v. Lowell Sun Publishing Co., 404 Mass. 9,11 (1989). When examining allegedly libelous statements, the court must take into consideration all relevant circumstances, including the persons to whom the statements were published, the medium by which they were disseminated, how the words used in the statement were commonly understood and the broad context or circumstances in which the statements are made. Cole v. Westinghouse Broadcasting Corp., 386 Mass. 303, 309 (1982), cert, denied, 459 U.S. 1037 (1983); Yovino v. Fish, 27 Mass.App.Ct. 442, 447-48 (1989). Statements of pure opinion, as compared to an opinion implying a basis in undisclosed defamatory facts, are not actionable. Myers v. Boston Magazine, 380 Mass. 336, 339 (1980); National Association of Government Employees, Inc. v. Central Broadcasting Corp., 379 Mass. 220, 227 (1979).

That is so regardless of who has the burden of proving truth. See generally McAvoy v. Shufrin, 401 Mass. 593, 597 & n.4 (1988).

Although the Supreme Court of the United States first applied the “actual malice” standard only to “public officials,” later cases expanded its application to “public figures,” i.e., those individuals who thrust themselves, or were drawn, into the debate surrounding an important public controversy. Curtis Publishing Co. v. Butts, 388 U.S. 130 (1967). Given the view I have taken of McNulty’s status as a public official, I need not determine whether, for purposes of the present controversy, he is also a “public figure.”

“Actual malice,” in the context of an action for libel, thus is a term of art that has nothing to do with common-law malice or with hatred or ill-will. See, e.g., Rosenbloom v. Metromedia Inc., 403 U.S. 29, 52 n.18 (1971). Private individuals need show only that a defamatory statement was published with a negligent disregard for its truth or falsity. New England Tractor-Trailer Training of New England v. Globe Newspaper Co., 395 Mass. 471,477 n.4 (1985); Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 851, 858 (1975).

The constitutional privilege established in New York Times is not simply a privilege designed to protect the media’s right to publish. Indeed, the media has no greater rights under the constitution than the ordinary citizen. Casso v. Brand, 776 S.W.2d 551, 554 (Tex. 1989) and cases cited. See generally, Pickering v. Board of Education, 391 U.S. 563, 573 (1968). Although this controversy arises in the context of an employment dispute, those responsible for management of the school system surely have no less right to discuss another school employee than would a member of the general public.

Although not dispositive and often an inconclusive guide, as principal of a regional high school in a community that holds education in high regard, McNulty undoubtedly enjoyed greater access to effective communication than private individuals usually enjoy and thus would have an opportunity to counteract false statements. See Stone v. Essex County Newspapers, Inc., supra, 367 Mass, at 864, citing Gertz v. Robert Welch, Inc., 418 U.S. 323, 351-52 (1983).

Today, at least, there simply can be no doubt that a sexual liaison between a workplace superior and subordinate, whether or not it takes place during working hours, is a matter highly charged with at least the potential for adverse ramifications for the employer, here the Regional School District. See generally College-Town, Division oflnterco, Inc. v. MCAD, 400 Mass. 156, 163-67 (1987). To that extent, at least, such a liaison is not a “private” matter.

Insofar as Kessler and Baker are concerned, those motives spring essentially from what McNulty claims is a “we-don’t-like-him-and-therefore-are-going-to-get-him” attitude. Any suggestion that that motive was the driving force in everything that happened must overlook the nature and extent of the findings made by the New England Association of Schools and Colleges. The motives ascribed to MacLeod, on the other hand, arise out of a dark and unsavory jealousy that has no proper place in the workplace or anywhere else. That motive’s existence, however, does not in and of itself strip MacLeod’s statements of their constitutional protection.

 In that regard, questions asked by Baker of faculty members about “rumors” of an affair between Sliwa and McNulty do not require different treatment. There is no evidence that Baker subjectively entertained serious doubt as to the rumors’ truth. See Pacella v. Milford Radio Corp., 18 Mass.App.Ct. 6, 11-12 (1984). Moreover, there is no doubt that such rumors existed. In the setting in which they were circulating, the very existence of those “rumors” had, or so one could conclude, an impact on McNulty’s ability to manage the school. The extent of faculty members’ knowledge about the rumors and their reactions to the rumors thus was a legitimate subject for inquiry even if Baker had doubts about the truth of the rumors. Cf. Edwards v. National Audubon Society, 556 F.2d 113, 120 (2d Cir. 1977), cert, denied, 434 U.S. 1002 (1977).

That, of course, is not the only conclusion a fact-finder could draw. Indeed, a fact-finder could conclude that Kessler conducted an investigation with the kind of thoroughness that the serious nature of the allegations warranted.

To the extent that their actions were privileged under the common-law privileges discussed above, they also were immune from claims for intentional interference with contractual or advantageous relationships. See Gram v. Liberty Mutual Ins. Co., 384 Mass. 659, 663-64 (1981).

The count seeks only injunctive relief and Kessler, at least, has moved elsewhere since the action started. He thus has no power to allow or deny access to records the school or school system maintains.